ANNA R. McGRATH

v.

WILLIAM F. NORCROSS.

[Decided February 3d, 1911.]

1. The act of June 5th, 1787 (*2 Gen. Stat. 1895 p. 1972* § *3*), provides that any survey made by the proprietors of the State of New Jersey and inspected and approved by the general proprietors, or council of proprietors of either division of the state, and by their order recorded in the secretary of state's office or in the surveyor-general's office within the division, shall, after such record, "preclude and forever bar such proprietors and their successors from any demand thereon."—*Held*, that the statute does not bar a former proprietor or his grantee to whom an allotment in severalty had theretofore been made by an unrecorded survey, and does not nullify outstanding unrecorded surveys as against subsequent surveys at the time of record, but only bars the proprietors from asserting a claim to lands covered by surveys which had been duly inspected, approved and recorded.

2. The act of March 27th, 1719 (*Allin. L. p. 43*), requires the surveyors-general of the two divisions of the province to establish offices at places specified, in which offices shall be entered the surveys of all lands subsequently made within the province, and that all certificates of surveys in the hands of any of the inhabitants of the province or of any of the neighboring provinces which are not within two years duly recorded, and all surveys made, the certificates whereof are in the hands of people living beyond seas, which are not within three years duly recorded either in the recorder's office or in the surveyor-general's record, shall be void, and any succeeding survey made and recorded shall be good and sufficient as if no former survey had been made.—*Held*, that the statute is merely regulative with a purpose to avoid confusion rather than to establish the record as a jurisdictional step essential to give vitality to a survey.

3. *Rev. Stat. 1847 p. 642* provided that conveyances should be recorded in the office of the clerk of the court of common pleas of the county "in large well-bound books of good paper to be provided for that purpose," and directs that such records shall be received in evidence in any court of the state.—*Held*, that the record of a deed in a book, endorsed "Book A of Miscellaneous Records," recorded while that statute was in force and before the passage of *P. L. 1898 p. 686* § 41, providing for the record of deeds in a book "to be called and backed 'Deeds,'" was admissible in evidence.

4. Recital in an ancient deed of any antecedent deed or document consistent with its own provisions will be presumptive proof of the former

existence of such deed or document, especially where no evidence is offered to rebut such presumption.

5. In a suit to quiet title, recitals of title in ancient deeds are admissible to establish the fact of a lost prior survey supported by a valid warrant, or of a survey that has been subsequently approved by the council of proprietors, upon which the title of the party offering the deeds depends.

6. Under *Pat. L. p. 398*, rendering a conveyance of no effect against a subsequent purchaser for a valuable consideration unless the conveyance is recorded prior to such purchase, unless the purchaser had notice of the instrument at the time of the purchase, the burden of proof of such notice rests upon defendant in a suit to quiet title brought by a complainant who claims under such purchaser against a defendant claiming under the unrecorded conveyance.

7. Where a purchaser of land for a valuable consideration takes without notice of a prior conveyance, his title may be transmitted to others free from the operation of the unrecorded conveyance, although such others are charged with notice.

8. Evidence in a suit to quiet title *held* insufficient to show that a purchaser of property, under whom complainant claimed, had notice of a prior conveyance under which defendant claims.

On bill to quiet title.   On motion for new trial.

The bill in this suit was filed by complainant pursuant to our statute (*3 Gen. Stat. p. 3486*), to quiet title to a tract of land in Atlantic county. Defendant answered, claiming title in himself. An issue at law was framed and tried in the supreme court and a verdict was there rendered by the jury in favor of defendant. The proceedings in the law court have been duly returned to this court and complainant now moves for a new trial.

*Messrs. Collins & Corbin,* for the complainant.

*Messrs. French & Richards,* for the defendant.

LEAMING, V. C.

I regret that I have been compelled to reach the conclusion that a new trial in this case is necessary.

The rules which must control this court in motions of this nature have been recently defined by our court of errors and appeals in *McAndrews & Forbes Co.* v. *City of Camden,* November

term, 1910.   It is there held that the jurisdiction conferred upon the court of chancery by the statute under which this suit is brought is merely an extension of its ancient function of entertaining bills *quia timet,* and that on motions in this court for a new trial after a trial of an issue by the law court, the same practice should prevail under the statute as that which prevailed under like conditions on a bill *quia timet.*   That practice is there defined as follows:

"The ordinary practice of the court (of chancery) on such bills, when an issue at law has been directed, and the verdict rendered thereon was attacked, was to consider alleged trial errors as well as the evidence reported to it by the law court for the purpose of determining whether the erroneous rulings (if they appeared) were such as to destroy the value of the verdict as a means of satisfying the conscience of the chancellor."

An appropriate consideration of the error which, in my judgment, was in this suit operative to destroy the vitality of the verdict rendered by the jury, seems to necessitate a somewhat extended examination of the details of the controversy between the respective parties.

The title claimed by complainant is as follows:

1. Survey from the council of proprietors to the West New Jersey Society for thirty-three thousand and seventy-eight acres of land near Mays Landing.   This survey was made pursuant to warrant dated January 18th, 1739, and returned under date of June 9th, 1748, and by the council of proprietors inspected, approved and ordered to be recorded August 4th, 1748, and recorded in Book E of Surveys, page 30.   Defendant denies that the *locus in quo* is within the boundaries of this survey.

2. Survey from the council of proprietors to West New Jersey Society for thirty-six thousand two hundred and forty-four acres. This survey was made pursuant to a warrant dated January 18th, 1739 (the same warrant above referred to), and was returned under date of May 1st, 1750, and inspected, approved and ordered to be recorded August 9th, 1750, and recorded in Book E of Surveys, page 203.   This survey does not include the *locus in quo,* but is introduced because of the resurvey, next referred to, which resurvey recites the beginning corner of this survey as its

beginning corner, and also recites that it includes within its boundaries the land covered by this survey and the survey first above referred to. The exterior boundaries of this survey are by the survey said to contain thirty-seven thousand six hundred and thirty-eight acres; there is then excepted from it thirteen recited prior surveys, aggregating one thousand three hundred and ninety-four acres, thus making the net acreage of the survey thirty-six thousand two hundred and forty-four acres. Five of the surveys thus excepted are recited as having been made by the council of proprietors to "Edmon Iliff" for eight hundred acres.

3. Resurvey from the council of proprietors to the West New Jersey Society for seventy-eight thousand sixty and thirty-five hundredths acres. This survey was made pursuant to warrant dated May 9th, 1771, requiring the surveyor-general to resurvey to the West New Jersey Society "all or any of their lands in the western division of New Jersey according to the ancient bounds thereof." The resurvey was returned under date of May 5th, 1774, and was inspected, approved and ordered to be recorded, and recorded in Book T of Surveys, page 45. This resurvey recites its beginning corner as the beginning corner of the survey, second above referred to, and recites that there are contained within its exterior boundaries eighty-five thousand nine hundred and seventy-three and thirty-five hundredths acres; there is then excepted from it a large number of surveys which are recited as having been prior to that time made to the several persons therein named. The aggregate acreage of the prior surveys so excepted is seven thousand nine hundred and thirteen acres, "which, being deducted from the whole contents above recited, there will remain to the society the quantity of seventy-eight thousand sixty and thirty-five hundredths acres." Among the excepted prior surveys are eight surveys to "Edmund Iliff," containing three thousand five hundred and twenty acres. The resurvey then recites that there had formerly been surveyed to the West New Jersey Society thirty-three thousand and seventy-eight acres by survey recorded in Book E, folio 30 (the first survey above set forth), and that another survey had been made to the West New Jersey Society of land adjoining on the northeast of the former survey, containing, by the survey, thirty-

six thousand two hundred and forty-four acres (the second survey above set forth), and that the two surveys aggregate in acreage sixty-nine thousand three hundred and twenty-two acres, but as the resurvey contains seventy-eight thousand and sixty and thirty-five hundredths acres within its bounds,

"exclusive of the prior surveys aforesaid, there is consequently within the lines thereof eight thousand seven hundred and thirty-eight and thirty-five hundredths acres which hath not been properly located, therefore in order to secure the said land to said society there is hereby appropriated within the lines of the same the like quantity of unlocated lands in part of a warrant * * * dated March 29th, 1717."

The *locus in quo* is admittedly within the exterior boundaries of this resurvey.

4. Deed of conveyance from West New Jersey Society to Charles Shoemaker, George Ashbridge, Morris Robeson, John Paul and Joseph M. Paul. This deed bears date December 15th, 1802, and was recorded December 25th, 1802, in the office of the clerk of Gloucester county, which county at that time embraced the lands now in controversy. This deed of conveyance recites as the source of title of the society the two surveys and the resurvey above set forth, and conveys to the five grantees, as tenants in common, the seventy-eight thousand and sixty and thirty-five hundredths acres described in the resurvey.

5. Deed of conveyance from Charles Shoemaker, Morris Robeson, John Paul and Joseph M. Paul (four of the five grantees above named), to Joseph Ball and Samuel Richards, as tenants in common, for an undivided three-fourths of the land covered by the resurvey above referred to. This deed bears date April 6th, 1808, and was recorded April 7th, 1808, in the clerk's office of Gloucester county—Atlantic county not having been set off from Gloucester county at that time.

6. By deed dated May 7th, 1829, Mary Condit, as heir-at-law of George Ashbridge (the other grantee above named of the West New Jersey Society), conveyed to Samuel Richards the remaining one-fourth of the land covered by the resurvey above referred to. This deed was recorded in the clerk's office of Gloucester county October 24th, 1829.

7. By sundry conveyances from the several heirs of Joseph

Ball, dated between the years 1822 and 1839, the interest of Joseph Ball, above referred to, was conveyed to Samuel Richards. This constituted Samuel Richards, in 1839, the owner of the entire resurvey which was conveyed by the West New Jersey Society to the five grantees above named in 1802.

8. Sundry devolutions of title from Samuel Richards to complainant, some of which will necessarily be hereinafter specifically referred to.

Defendant claims title under a survey for seven hundred acres alleged by defendant to have been made by the council of proprietors to Edmund Iliff prior to the date of the survey first above referred to. No survey for seven hundred acres from the council of proprietors to Edmund Iliff has been recorded, and the original survey has not been produced. All knowledge of that survey which now exist is derived from references to it contained in other instruments. Defendant claims that it is one of the eight surveys to Edmund Iliff referred to in the resurvey above set forth as excepted therefrom.

It is urged in behalf of complainant that the third section of the act of June 5th, 1787 (*2 Gen. Stat. p. 1972*), is operative to nullify all unrecorded surveys which were outstanding at the date of the passage of the act as against all surveys of a later date which were at that time of record. I am unable to attribute that effect to the section of the act referred to. The section provides as follows:

.'"That any survey, made of any lands, within either the eastern or western division of the proprietors of the State of New Jersey, and inspected and approved of by the general proprietors, or council of proprietors of such division, and by their order or direction entered upon record in the secretary's office of this state, or in the surveyor-general's office in such division, shall, from and after such record is made, preclude and forever bar such proprietors and their successors from any demand thereon, any plea of deficiency of right or otherwise notwithstanding."

The bar, as expressed in the section, is against "the proprietors and their successors." I do not think that the words last quoted can be appropriately held to include a former proprietor or the grantee of a former proprietor to whom an allotment in severalty had theretofore been made by an unrecorded survey.

A proprietor to whom a survey had been made was no longer a proprietor as to the land so set apart to him in severalty, and his grantee was not the successor of a proprietor. I think the section was intended to bar the proprietors from assertions of claims of rights in any lands covered by surveys which had been duly inspected, approved and ordered recorded and recorded in either the office of the secretary of state or surveyor-general of the proper division. I am unable to reach the conclusion that it was intended to be operative to nullify all outstanding unrecorded surveys which at that time existed as against subsequent surveys at that time of record. The first legislative act which I have been able to find touching the recording of surveys is the act of March 27th, 1719. *Allin. L. p. 43.* By section 10 of that act the surveyor-general of the eastern division of the province is required to establish an office at Perth Amboy for that division, and the surveyor-general for the western division a like office at Burlington for the western division of the province,

"in which offices respectively shall be carefully entered and kept the surveys of all lands which shall hereafter be made within this province; and such entries shall be of record, and may be pleaded as evidence in any of His Majesty's Courts of Judicature within this Province."

Then follows a provision for gathering together in these two offices evidence touching outstanding surveys. By the following section it is provided:

"AND WHEREAS, great inconveniences have happened by the making and not recording of surveys, whereby many have not only got lands surveyed which have been formerly surveyed, not knowing of any former survey, but have settled and made great improvements of the same, and have been afterwards ousted thereof; for the remedying whereof for the future, it is hereby enacted and declared by the authority aforesaid, that all surveys heretofore made, the certificates whereof are in the hands of any of the inhabitants of this province, or any of the neighboring provinces which are not within two years, and that all surveys heretofore made, the certificates whereof are in the hands of people living beyond seas, which are not within three years after the publication hereof, duly recorded, either in the recorder's office, or in the surveyor general's record, of the respective division in which such lands are surveyed, be forever hereafter void and of none effect; and any succeeding survey, duly made thereof and recorded, shall be as good and sufficient as if no former survey had been made."   ·

It will be observed that the section above quoted in full relates only to surveys theretofore made; such surveys are nullified unless recorded within the periods named in the act. The evidence does not disclose whether the Iliff survey, under which defendant claims, was made before or after the passage of that act. The other section relates alone to surveys thereafter made; such surveys were to be entered and such entries should be of record. No express provision is contained in the act touching the effect of a failure of the surveyor-general to "enter" a survey which may thereafter be regularly made and returned and be formally inspected and approved by the council of proprietors. In the absence of such express provision, I think the section must be regarded as one merely regulative with a purpose to avoid confusion, rather than the establishment of the record as a jurisdictional step essential to give vitality to a survey. This is the view which I think may be said to have been entertained by Chief-Justice Kirkpatrick in *Arnold* v. *Mundy, 6 N. J. Law (1 Halst.) 1.* The next act touching the record of surveys appears to be the act of 1787 already referred to.

It will also be observed that the resurvey under which complainant claims, after describing its exterior boundaries, expressly excepts from its operation eight surveys prior to that time made to Edmund Iliff aggregating three thousand five hundred and twenty acres. It seems to me manifest that had defendant produced at the trial an original unrecorded survey to Edmund Iliff containing a proper endorsement of its inspection and approval by the council of proprietors, and had the survey thus produced been found to be one of the eight excepted surveys and to comprise the *locus in quo,* complainant's claim under the resurvey must have failed as against the unrecorded survey, because the resurvey could not, in such case, be held to vest a title in severalty to land thus expressly excepted from its operation.

Before proceeding to examine the evidence offered by defendant to establish the unrecorded Iliff seven-hundred acre survey, it may be noted that the first survey to the West New Jersey Society does not contain an exception of any survey to Iliff, and complainant urges that it covers the *locus in quo* and is operative as a bar to any prior unrecorded Iliff survey within its boun-

daries. The learned trial court proceeded upon the theory that if the boundaries described in that survey comprised the *locus in quo,* it was operative as a bar to any prior unrecorded survey to Iliff, and so instructed the jury, and specifically submitted to the jury the determination of the fact as to whether the boundaries of that survey included the *locus in quo.* With the accuracy of that instruction we are not here concerned, for it was in conformity to the claim of complainant and against the contention of defendant, and under it the jury necessarily determined by their verdict that the *locus in quo* was outside the boundaries of that survey, if they relied at all upon the Iliff survey as the basis of their verdict. That finding should not be here disregarded unless it clearly appears that there was insufficient evidence to sustain it. I think it here unnecessary to fully review the evidence touching the boundaries of that survey. The termination of its second course is a point near the mouth of Babcock creek. If the Babcock creek referred to is the creek now known by that name, the survey cannot include any part of the *locus in quo,* as that creek is an easterly branch of Egg Harbor river. The map accompanying the return to this survey also delineates this point as on the easterly side of Egg Harbor river. I am unable to conclude that the evidence does not justify a finding that the *locus in quo* is not within the bounds of that survey.

The claim of title of defendant, so far as that claim emanates from the unrecorded Iliff survey, is as follows:

Deed of conveyance from Edmund Iliff to Thomas Denny, dated April 9th, 1743; acknowledged on the same date before a judge of the court of common pleas. This deed was not recorded until August 9th, 1847, and was then recorded in the clerk's office of Atlantic county in Book A of Miscellaneous Records. This deed conveys several tracts of land. The first tract is described as follows: "First tract is seven hundred acres, surveyed to the said Edmund Iliff, and begins," &c. Then follows a description by courses and distances. The evidence adduced at the trial justifies a finding that this description is the *locus in quo.* It will be noted that this deed was executed some years prior to the first survey under which complainant claims. Complainant urges that the record of this deed, in a book endorsed

"Book A of Miscellaneous Records," cannot be received in evidence. That claim would seem to be well founded under our present Recording act, which act requires deeds to be recorded in a book "to be called and backed 'Deeds.'" *P. L. 1898 p. 636 § 41.* But the Recording act, which was in force at the time the deed in question was recorded, was the act of April 15th, 1846. That act provided that deeds and conveyances should be recorded in the office of the clerk of the court of common pleas of the county "in large well-bound books of good paper, to be provided for that purpose, and carefully preserved." *Rev. Stat. 1846 p. 642 § 9.* Section 13 of that act directs that such record shall be received in evidence in any court of this state, "and be as good, effectual and available in law as if the original deed or conveyance were then and there produced and proved." At the time of the record in question most of the deeds of land in Atlantic county were recorded in the office of the clerk of the court of common pleas of that county in books which were endorsed "Deeds," but some were recorded in the book endorsed "Miscellaneous Records." Both books contained indexes of their contents. In view of the fact that the only statutory requirement at that time was that the book in which a deed might be recorded should be a book provided for that purpose, I am unable to reach the conclusion that the book in question was not properly received in evidence.

The next deed in the line of defendant's title is a deed from Thomas Denny, the grantee named in the deed last above set forth, to Richard Somers. This deed bears date June 17th, 1786; was acknowledged December 25th, 1786, and recorded in the office of the secretary of state February 6th, 1835. The description of the land conveyed by this deed is the same as that contained in the deed from Iliff to Denny, excepting that some additional landmarks are supplied. At the conclusion of the description the following recitation of title is set forth:

"Containing seven hundred acres more or less, which survey formerly belonged to Edmund Iliff and is one of the eight tracts excepted out of the Society's re-survey for him, and was conveyed by said Iliff to the aforesaid Thomas Denny the present grantor by deed of the
day of        ."

· The evidence justifies a finding by the jury that the land described in this deed is the *locus in quo*. It will be observed that the two men who are grantor and grantee, respectively, in this deed, are the two deputy surveyors who made return of the re-survey under which complainant claims, and that in this deed the land conveyed is by them referred to as one of the eight Iliff surveys excepted from the resurvey.

Richard Somers subsequently died, leaving a will bearing date November 20th, 1723, and proved April 20th, 1795. His estate passed to his three children—Constant Somers, Richard Somers, and Sarah, wife of Jonas Keen, Sarah subsequently acquiring whatever estate her father may have had in the *locus in quo*.

By sundry conveyances the title of Sarah Keen has been transmitted to defendant.

From the foregoing it will be observed that the deed from Iliff to Denny conveys a seven-hundred-acre tract of land which the evidence sufficiently defines as the *locus in quo*, and recites that the tract was surveyed to Edmund Iliff. Also that the deed from Denny to Somers conveys the same tract and recites that the tract is a survey formerly belonging to Edmund Iliff, and is one of the eight tracts excepted out of the society's resurvey, and was conveyed by Iliff to Denny. The jury were permitted to consider these recitations of title in these deeds to aid them in determining whether the *locus in quo* was one of the eight Iliff surveys excepted out of the resurvey from the council of proprietors to the West New Jersey Society. In this I do not think there was error. In *Fuller* v. *Saxton, 20 N. J. Law (Spenc.) 61, 65*, it is said:

"A recital in an ancient deed or will of any antecedent deed or document consistent with its own provisions, will, after the lapse of such a period, be presumptive proof of the former existence of such deed or document, and especially where no deed, declaration, act or claim is shown to rebut such presumption."

This view has been approved and followed in *Havens* v. *Sea Shore Land Co., 47 N. J. Eq. (2 Dick.) 365, 375*, and *Rollins* v. *Atlantic City Railroad Co., 73 N. J. Law (44 Vr.) 64, 67*. In the present case the evidence of the seven-hundred-acre survey to Iliff is measurably strengthened by the fact that the resurvey,

under which complainant holds, excepts eight several surveys theretofore made to Iliff within the boundaries of the resurvey. In the absence of evidence upon the part of complainant satisfactorily identifying eight prior Iliff surveys in such manner as to exclude the possibility of the seven-hundred-acre Iliff survey being one of the exceptions referred to in the resurvey, these recitations of title should, I think, be given additional weight. Effort was made by complainant to identify the eight prior Iliff surveys which the resurvey refers to as within its boundaries; the testimony of Mr. Middleton, offered for that purpose, is far from conclusive. I am, however, here considering these recitations of title in ancient deeds only with reference to their force to establish a title in defendant. In permitting the jury to consider these recitations of title in these ancient deeds, in aid of the effort of defendant to establish the fact of a lost prior survey, I think no error was committed.

It is also urged in behalf of complainant that even though the recitations of title in these ancient deeds may afford presumptive evidence of a lost survey from the proprietors to Iliff of the *locus in quo,* yet the recitations refer only to a survey, and cannot be properly treated as establishing the presumptive existence of a survey supported by a valid warrant or a survey that has been subsequently approved by the council of proprietors. I think that such a presumption necessarily includes a presumption of validity. A well-known historical fact may, I think, be here appropriately referred to, showing the necessity of recognition of presumptions in the establishment of early titles. It is well known that in the county of Cape May no title can be traced to the proprietors, except as to the extreme north end of Peck's Beach. Every home and every tract of outlying land in that county, with the exception noted, as I understand it, may be to-day surveyed by the council of proprietors to any person with a proper warrant, and a valid title in severalty will vest by reason of such survey, unless the present supposed owners can protect their rights by adverse possession or by relying upon a presumption of a lost survey from the council of proprietors. These titles in the county referred to all emanate from the West New Jersey Society; none can be traced further back. No

survey or record of a survey exists from the council of proprietors to the West New Jersey Society or to any other person. All title in that county, with the exception noted, thus rest upon the presumption of a valid title in the West New Jersey Society under the council of proprietors. I am not here concerned with the extent to which that presumption may be invoked in behalf of titles in the county referred to; I merely refer to the well-known conditions there existing as a matter of historical interest and for the purpose stated.

I have thought it necessary to set forth the claims of the respective parties thus fully to adequately disclose the force and importance of the instrument now to be considered.

As already stated, in the year 1805, the title under which complainant claims rested in Shoemaker, Ashbridge, Robeson, John Paul and Joseph H. Paul, as tenants in common, as grantees of the West New Jersey Society; while the title under which defendant claims through the Iliff survey rested in Sarah Somers. Under date of March 12th, 1805, an instrument is claimed to have been executed by these five co-tenants, on one part, and Sarah Keen on the other part, wherein the Iliff survey is recognized and its boundaries are defined and agreed upon, and such rights as the five co-tenants might have therein are quitclaimed to Sarah Keen; the land so quitclaimed includes the *locus in quo.* That instrument was not recorded until June 1st, 1847, on which date it was recorded in Book A of Miscellaneous Records in the clerk's office of Atlantic county. The genuineness of this instrument is challenged by complainant. The original document has not been produced and the record book containing a copy of it was admitted in evidence. The material parts of that instrument, as it appears of record, are as follows:

"Know all men that upon surveying the following described tracts of land all of which were owned by and in possession of the late Colonel Richard Somers at the time of his decease and are now owned by and in possession of the representatives of said Colonel Richard Somers, lying within the West Jersey Society tract lately purchased by Charles Shoemaker, George Ashbridge, Morris Robeson, John Paul and Joseph H. Paul, the following boundaries were settled. established, fixed and agreed upon by the subscribers William Jonas Keen, acting on the part

of said estate of Colonel Richard Somers, and George Ashbridge, acting on the part of said purchasers of the West New Jersey Society Tract, at the running of the lines.

"The courses of the several tracts are here inserted following the original papers but the lines as run and fixed have and are to have the variations from the date of the survey or deed.

"Eight tract of land run out and established by us, consists of several surveys one of which was made to Edmund Iliff for three hundred and eighty-three acres, and another of seven hundred acres and another of one thousand one hundred and fifty acres, and a survey for one hundred and fifty-four acres made to Constant Somers and two hundred and sixty-five acres made to Samuel Risley, the two last lay outside the West Jersey Society Tract, but adjoin the same, and the outside boundaries of said tracts are agreed upon and established as follows:"

Then follows descriptions of the land by courses and distances. The evidence justifies a finding that the *locus in quo* is within the boundaries described. The instrument then continues as follows:

"All of which tracts of land hereinbefore mentioned are hereby settled, fixed, run out and established, each party mutually agreeing with the other to abide by the line as now run hence forward forever. That said George Ashbridge, for himself and his associates hereby forever releasing and quit claiming all the said several tracts of land and every part of them to the heirs and representatives of the said Colonel Richard Somers, their and each of their heirs and assigns."

Then follows certain stipulations touching leases and other matters, after which the agreement concludes as follows:

"In witness of all the agreements, grants, leases, quit claims, covenants, settlements and other matters therein stated, the said George Ashbridge for himself and his associates and the said William Jonas Keen on the part of the representatives of the estate of the said Colonel Richard Somers have hereto interchangeably set their hands and seals the 12th day of March A. D. one thousand eight hundred and five (1805)."

The agreement is then signed and sealed by George Ashbridge and William Jonas Keen, and witnessed by three subscribing witnesses. There is then added to the agreement the following:

"We, the subscribers, being interested in the lands above described and the matters and things set out in the above instrument and being satisfied with the agreements, grants, lease, quit claims, covenants, set-

tlements and establishment of lines of the several tracts mentioned therein all of which having belonged to Colonel Richard Somers at the time of his death now belong to his heirs, do hereby signify our assent and agreement to the same making ourselves parties thereunto in all things. In witness whereof we hereunto mutually and interchangeably set our hands and seals this 26th day of March, A. D. one thousand eight hundred and five (1805)."

This is signed and sealed by Sarah Keen, and by the four co-tenants of Ashbridge, and witnessed by two of the three subscribing witnesses who witnessed the original instrument. This instrument was proved by one of the subscribing witnesses the day before it was recorded.

It will be observed that after this instrument was executed, and many years before it was recorded, Samuel Richards became a purchaser for value of the tract covered by the resurvey. His purchase was from and under the co-tenants who executed that instrument.

The first legislative act declaring void an unrecorded deed or conveyance as against subsequent purchasers for value without notice, appears to be the act of June 7th, 1799. *Pat. L. p. 395.* That act applied to deeds made on or after January 1st, 1800. Prior to that date I find no act for the province of West New Jersey relating to the record of deeds of conveyance, which does more than prescribe a fine for failure to record. See *Leam. & Spi. Gr. & Conc. 541.* By the terms of the eighth section of the act of 1799, the instrument now in question was rendered "void and of no effect" against Samuel Richards, as purchaser for valuable consideration, by reason of its not having been recorded prior to his purchase, unless he had notice of the instrument at the time of his purchase. The burden of proving such notice rests upon defendant. *Paul* v. *Kerswell, 60 N. J. Law (31 Vr.) 273, 275; Protection Building Association* v. *Knowles, 54 N. J. Eq. (9 Dick.) 519, 529.* It is also well settled that if the title of Samuel Richards was acquired by purchase for a valuable consideration without notice, his title thus relieved from the operation of the prior unrecorded instrument may be transmitted to others free from its operation, even though they may be charged with notice. *Holmes* v. *Stout, 4 N. J. Eq. (3 Gr.*

*Ch.*) *492; Roll* v. *Rea, 50 N. J. Law (21 Vr.) 264, 267.* It is apparent, therefore, that this instrument cannot be used in derogation of the title of complainant, who holds under Samuel Richards, unless it could be so used against the title of Samuel Richards. The instrument was, however, so used at the trial. It was received in evidence, and treated not only as a recognition by complainant's predecessors in title of the sufficiency of defendant's title under Iliff, but also as a new source of title for defendant, and also as a bar to complainant's right of recovery, provided only that the jury should find the instrument to be free from the taint of forgery. Touching that instrument, the learned trial court charged the jury as follows:

"If you find that the land in dispute passed to the West New Jersey Society and thence down to their grantees, you must then consider another question, namely, assuming that Iliff never acquired title, and that the West New Jersey Society did acquire title, then what effect shall be given to the agreement of quitclaiming and settlement of lines."

Then, after reading from the instrument at some length, the charge proceeded as follows:

"So that whether the seven-hundred-acre survey passed through Iliff to Denny and through him to Somers or not, by that agreement Ashbridge, Robeson, the Pauls and Shoemaker, who had purchased the large tract from the West New Jersey Society, released and quitclaimed forever their interest in that property to the heirs of Somers."

Then, after reviewing the evidence touching the claim of forgery, the charge proceeds:

"If you are convinced of that fact, that it is a forgery, if you are convinced from the testimony which has appeared in the case that it is a forgery, then you have a right to give effect to such conviction and treat it as such. If you come to the conclusion that it is void because no such deed ever properly issued, of course you will ignore it. But if you give effect to that deed, the Ashbridges and Robesons and the Pauls, who acquired title from the West New Jersey Society, relinquished their claim to Somers for the consideration therein mentioned."

The ninth request to charge, submitted in behalf of complainant, was to the effect that the instrument in question was void as against purchasers for value mediate or immediate from Shoemaker, Ashbridge, Robeson, Paul and Paul without notice thereof, by reason of its not having been recorded prior to the year 1847. This request was refused.

To impute notice of the instrument in question to Samuel Richards, defendant offered in evidence the files of the court of chancery in a suit brought in that court by Steven Caldwell and Walter D. Bell, in the right of their respective wives, Sarah B. Caldwell and Elizabeth A. Bell, who were devisees of Samuel Richards, against Joseph E. West and Daniel E. Estell, who then held title under Sarah Somers. That bill was filed in the year 1847, shortly after the instrument now under discussion had been recorded, and sought to set aside the record of that instrument, and to set aside as fraudulent the proof of the instrument which had then been recently made by a subscribing witness. Answers were filed to that bill by the several defendants, and the bill was subsequently dismissed for want of prosecution. These files were admitted in evidence, and admittedly the answer of West was read to the jury at considerable length. It is urged in behalf of defendant that as that bill called for answers under oath, and the answers, in consequence, became evidence against the complainants in that suit, these answers may now be used in evidence against complainant. As that suit did not reach a final decree on the merits, and no *lis pendens* was filed, I am unable to discern any theory upon which defendant, as a purchaser for value, can be said to be bound by the averments contained in the answers filed to that bill; but assuming the contrary, I have been unable to find in the answers in question any averments sufficient to justify a finding that Samuel Richards purchased with notice of the instrument in question. The answer of Joseph E. West contains the averments which are now urged as sufficient for that purpose. In that answer, Joseph E. West nowhere states as a fact that Samuel Richards had knowledge of the instrument in question prior to the time he purchased. He states that George West, his father, purchased from

Sarah Keen in the year 1813, and soon after saw a duplicate of the instrument in question in the possession of Joseph Ball, who was then a co-tenant of Samuel Richards. It is not averred that Joseph E. West, the answering defendant, was present or possessed personal knowledge of the fact stated; nor could Samuel Richards be bound by the knowledge of his co-tenant. By that answer, it is further stated by Joseph E. West that he exhibited the instrument in question to Samuel Richards in Richards's lifetime; but it is not stated and cannot be properly inferred that this occurred before Samuel Richards had acquired title. As already pointed out, Samuel Richards became a co-tenant with Ball in the year 1808, and purchased an additional one-fourth interest in the year 1829, and the remaining smaller undivided interests between 1822 and 1839. The agreement, which the answer recites as having been made between Joseph E. West and Sarah Keen in the year 1817, recites that the instrument in question is in the possession of Ball and Richards, but Richards cannot be bound by that recitation, and the *ex parte* affidavits of persons not parties to the suit cannot be treated as evidence. It therefore seems to be entirely clear that the files of the chancery suit were insufficient to establish the fact that Samuel Richards purchased with notice of the instrument now under discussion.

With that instrument improperly before the jury, both as an independent source of title of defendant and as a bar to the right of complainant to recovery, it seems manifest that the verdict is rendered essentially impotent; for with that instrument before the jury, with the potentiality named, no adequate consideration could be given to the case in its proper and essential aspect.