NADEAU, Respondent, *v.* THE TEXAS COMPANY, Appel-
LANT.

(No. 7,649.)
(Submitted April 26, 1937. Decided May 26, 1937.)
[69 Pac. (2d) 586, 593.]

*Mr. Y. A. Land* of the Bar of Denver, Colorado, and *Mr. Louis P. Donovan,* for Appellant, submitted a brief; *Mr. Land* argued the cause orally.

*Mr. E. K. Cheadle* and *Mr. H. C. Hall,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiff brought this action to quiet title to his interest, under an oil and gas lease on eighty acres of land in Glacier county. The case was tried before the court sitting without a jury. Findings of fact and conclusions of law were made in favor of the plaintiff. Judgment was entered in conformity therewith, and the appeal is from this judgment.

Plaintiff in his complaint alleged the corporate capacity of the defendant corporation; that on February 18, 1930, and thereafter, F. A. Ewald was the owner of this tract of land; that on February 9, 1934, Ewald executed and delivered to R. J. Reynolds an oil and gas lease which was duly recorded on the same day; that thereafter, on May 3, 1935, this lease was assigned by an instrument in writing to the plaintiff which was duly recorded on the following day; that plaintiff is the owner of this lease and the leasehold thereby conveyed, and that defendant claims some interest therein adverse to the plaintiff.

Defendant by its answer set forth numerous defenses. The first defense alleges that defendant claims adversely to plaintiff under an oil and gas lease executed by Ewald and wife on these lands to the defendant on September 26, 1933, and also a certain "unit operation and royalty pooling agreement," which it is asserted Ewald and wife agreed to execute on January 11, 1935. This agreement described all the lands in the section containing the tract in question. It was signed by numerous other land and royalty owners who, it is alleged, are necessary and indis-

pensable parties to the settlement of this controversy. Ewald never executed this written agreement.

By the second defense defendant admits its corporate capacity, the execution and recording of the lease by Ewald to Reynolds, and denies its validity; admits the execution and recording of the assignment of the Reynolds lease to the plaintiff, but denies that the lease was actually assigned; and admits that defendant claims adversely to the plaintiff. By other affirmative defenses it is alleged that the lease to Reynolds was without consideration—a mere sham or subterfuge; that it had terminated; that it was intended that this lease was not to become effective until the lease claimed by defendant was released, which had not occurred. Affirmatively defendant pleads its claim under the oil and gas lease executed by Ewald and wife, and also the unit and pooling agreement. By reply issue was joined on the affirmative allegations and defenses contained in the answer.

The trial court found that Ewald had been the owner of the lands since the year 1930; that he executed the lease to Reynolds as alleged in the complaint, and ever since its execution and delivery it has been a valid and subsisting oil and gas lease; also that the assignment was executed as alleged for a valuable consideration, and that plaintiff is the owner and holder of the lease in question; that the defendant claims an interest in these lands adverse to plaintiff, which claims are without right; and the judgment quiets the title in the leasehold interest in the plaintiff.

The defendant for some time prior to October 10, 1933, had been negotiating with Ewald with reference to a lease on these lands without arriving at an agreement. On that day Ewald delivered a signed and acknowledged oil and gas lease in favor of the defendant, describing the lands, together with a draft drawn on the defendant for the sum of $480 to a bank in Michigan. The draft was to be paid before the delivery of the lease. These documents were forwarded by the Michigan bank to a bank in Denver, Colorado. Twelve days were to be allowed the Texas Company for the examination of the title to the land.

On October 23, 1933, the defendant company advised Ewald that the abstract of title to the land disclosed that he was vested only with a one-half interest therein and requested particulars. He replied that he knew of no flaw in his title and would check up the matter on his early return to Montana. At the request of the Texas Company the time for payment of the draft was extended by Ewald on January 5, 1934. Ewald on January 27 of that year recalled the draft and lease from the Denver bank. The defendant had not paid the draft nor any consideration to Ewald for this lease. On February 1, 1934, the defendant delivered to the Denver bank a check for the draft which was by it endorsed to the clerk of the district court in Denver. At the same time an action was instituted by the defendant in the district court there to compel the delivery of the lease. Both the check and lease were impounded in this action, which has not been tried or decided.

On February 9, 1934, Ewald and wife executed and delivered the lease claimed by plaintiff, to Reynolds for a recited consideration of $3,000. It provided for the drilling of a well or the payment of delay rentals. This lease was assigned by Reynolds to plaintiff on May 3, 1935, for a consideration of $100 paid to Reynolds. The plaintiff was advised, according to the testimony, that the delay rentals "had been taken care of until August 1, 1935." It appears that they were not paid. Nadeau paid to Ewald the sum of $1,100 to cover rentals which might accrue under the terms of the lease during the pendency of the litigation in Denver. On May 15, 1935, plaintiff entered into an agreement with one Johnson for the assignment of an undivided one-half interest in the Reynolds lease, but no instrument of assignment was ever executed. This action was brought August 19, 1935. Other facts appearing from the evidence will receive consideration hereafter in the opinion.

Many questions have been raised by appropriate specifications of error. Defendant contends that, since the Reynolds lease was an "unless" lease and the rentals were not paid and no drilling was done strictly in accordance with the terms of the

lease, it was ipso facto terminated upon failure to comply with these provisions, citing in support of its contention the cases of *McDaniel* v. *Hager-Stevenson Oil Co.*, 75 Mont. 356, 243 Pac. 582, *Griffith* v. *Cedar Creek Oil & Gas Co.*, 91 Mont. 553, 8 Pac. (2d) 1071, *Williard* v. *Campbell,* 91 Mont. 493, 11 Pac. (2d) 782, and *Berthelote* v. *Loy Oil Co.,* 95 Mont. 434, 28 Pac. (2d) 187. While we have said in these and many other cases that an ''unless'' lease ipso facto terminates upon the failure of the lessee to drill or pay delay rentals as provided in the contract, yet none of these cases, with possibly one exception, involved the right of the lessor to waive or extend the time of performance of such terms by agreement.

The trial court found that this lease was valid and subsisting. Testimony is found in the record to the effect that Ewald accepted $1,100 from the plaintiff as and for delay rentals after the accrual of rentals. A lessor in an ''unless'' lease waives his power to declare a forfeiture for failure to drill or pay rentals within the time designated by the lease, by the acceptance of delay rentals after the breach has occurred. (Summers on Oil & Gas, sec. 156, p. 498, sec. 161, p. 512; *Blair* v. *Clear Creek Oil Co.,* 148 Ark. 301, 230 S. W. 286, 19 A. L. R. 430; *Southwestern Oil Co.* v. *McDaniel,* 71 Okl. 142, 175 Pac. 920; *Maud Oil & Gas Co.* v. *Bodkin,* 75 Okl. 6, 180 Pac. 959; *Miller* v. *Union Oil & Gas Co.* (C. C. A.), 295 Fed. 27; *Pyle* v. *Henderson,* 65 W. Va. 39, 63 S. E. 762; *Friend* v. *Mallory,* 52 W. Va. 53, 43 S. E. 114.) Likewise a lessor may waive his power of forfeiture for breach of the condition of the lease to drill or pay delay rentals, by a contract extending the time for commencement of drilling operations or the payment of delay rentals. (Summers on Oil & Gas, sec. 158, p. 501; *Pyle* v. *Henderson,* supra; *Ohio Oil Co.* v. *Detamore,* 165 Ind. 243, 73 N. E. 906; Cf., *Griffith* v. *Cedar Creek Oil & Gas Co.,* supra.)

Ample evidence is found in the record to justify the court in finding that the delay rental clause in the lease was waived by the lessor, and the court must have so found as a necessary implication to its finding that the lease was valid and subsisting.

Defendant argues the record demonstrates that since the plaintiff alleged in his complaint that he held his title under a lease dated in 1934, and the proof was to the effect that he was claiming under a later lease executed in 1935, a variance between the pleading and proof resulted. The basis of this argument is, first, that in the contract for an assignment of an interest in this lease from the plaintiff to Johnson reference was made to a lease from Ewald to plaintiff under date of May 3, 1935, as being executed and delivered; and, second, that although the plaintiff at one point testified as to the payment of $1,100 for delay rentals, at another he said it was for extending the lease or for delay rentals. The record discloses that the lease referred to in the agreement to assign was delivered into escrow and there held until after the trial of this cause in the lower court. Subject to certain exceptions not here involved, an instrument delivered into escrow to be delivered on the performance of certain conditions, does not become effective until delivery by the depositary. (Sec. 6846, Rev. Codes; *Knapp* v. *Andrus*, 56 Mont. 37, 180 Pac. 908; *Corey* v. *Sunburst Oil & Gas Co.*, 72 Mont. 383, 233 Pac. 909.) Furthermore it is noteworthy that in this assignment it is recited that plaintiff is the owner of the Reynolds lease, and that no such recitation is made relative to the ownership of the later lease. So far as this contract is concerned plaintiff apparently relied upon the lease declared on in his complaint, and in fact he could not rely on the later lease until the conditions of the escrow were performed.

It might be true, strictly speaking, that by the payments of the delay rentals a new contract was entered into; however, the basis of any such new contract was the old. The inception of the title to the leasehold was the old lease. However, plaintiff need not deraign his title in his complaint. (*Le Vasseur* v. *Roullman*, 93 Mont. 552, 20 Pac. (2d) 250; *Thomson* v. *Nygaard*, 98 Mont. 529, 41 Pac. (2d) 1.) To state a cause of action plaintiff need only allege himself to be the owner of the property described in the complaint and that the defendant

asserts some title adverse to him. (*Le Vasseur* v. *Roullman*, supra; *Slette* v. *Review Publishing Co.*, 71 Mont. 518, 230 Pac. ▉ 580.) Under the allegations of ownership plaintiff may prove such title as he has from whatever source he may have acquired it, and by any species of conveyances recognized by law. Special allegations control general ones if sufficient in themeslves; if insufficient, they are treated as surplusage. (*Thomson* v. *Nygaard*, supra.)

A variance between pleading and proof is not material unless ▉ it has misled the adverse party. (Sec. 9183, Rev. Codes.) If any variance may be found between the pleadings and proof, it was immaterial, as it did not mislead the defendant. (*Wasley* v. *Dryden*, 66 Mont. 17, 212 Pac. 491; *Vreeland* v. *Edens*, 35 Mont. 413, 89 Pac. 735.) In any event, the defendant has not called our attention to the fact that it raised the question of variance in the lower court; nor do we find from an independent investigation that it was in fact so raised, and hence it may not now be heard for the first time on appeal to complain of the variance. (*Mosher* v. *Sutton's New Theatre Co.*, 48 Mont. 137, 137 Pac. 534.)

It is contended that the Reynolds lease was a mere sham— a pretext. It is said that the witnesses were hostile. There is positive evidence in the record by these so-called hostile witnesses to the effect that the lease was valid. Defendant suggests the following facts as tending to overcome this positive testimony: The lease to defendant antedated the Reynolds lease; the pendency of the suit in the Denver courts at the date of the Reynolds lease; the filing of the lease for record on the day of its date; knowledge of defendant's claim by Reynolds, who gave as consideration for his lease his note which was subsequently returned to him and destroyed; failure of the lessor to demand compliance with the drilling provisions or payment of delay rentals in accordance with the strict terms of the lease; failure to make inquiry of defendant as to the nature of its claim; the sale of the lease to Reynolds for $100, followed by a sale a few days later of an undivided one-half interest in the same lease

for $2,000; continued admitted negotiations by Ewald of further leases to parties not in anywise involved in this controversy, and so-called exorbitant rentals provided in the lease itself.

The haste in recording the lease when it was known that others were claiming adversely would appear to have been only the exercise of common prudence in the circumstances of the case. Since one may lawfully agree to convey a title which he does not own, at some future time (*Huston* v. *Vollenweider*, 101 Mont. 156, 53 Pac. (2d) 112, and cases there cited), the mere attempt to negotiate a leasing of similar property may not be condemned. The remaining facts and the inferences which might reasonably be drawn therefrom at best merely create a conflict with the positive testimony to the contrary.

The trial court has found on this conflicting evidence against the contentions of the defendant. The state of the record is such that we cannot say that the evidence strongly preponderates against the court's findings, and hence, under the oft-repeated rule, we may not disturb the trial court's conclusions. (*In re Mullen's Estate*, 97 Mont. 144, 33 Pac. (2d) 270.)

Defendant contends that, since plaintiff entered into an agreement with Johnson to convey to him an undivided one-half interest in the lease, although the conveyance of the interest was never executed, an equitable estate arose in Johnson which has not been extinguished by any reconveyance, and hence a variance between the pleading and proof arose, in that plaintiff alleged he owned the entire leasehold interest when, in fact, he owned something less. If Johnson by this instrument acquired any present interest or estate in the leasehold, he became a tenant in common with the plaintiff in the ownership of the leasehold. A cotenant, in prosecuting or defending actions concerning the common property, may treat the same as his own as against everyone except his cotenant. (*Hopkins* v. *Noyes*, 4 Mont. 550, 2 Pac. 280; *Meagher* v. *Hardenbrook*, 11 Mont. 385, 28 Pac. 451; *Osnes Livestock Co.* v. *Warren*, 103 Mont. 284, 62 Pac. (2d) 206; Cf., *Lehman & Co.* v. *Skaden*, 84 Mont. 283, 274 Pac. 1067; sec. 9085, Rev. Codes.)

The defendant argues that there was a consummated agreement with reference to the lease transmitted to the Denver bank, and, therefore, the lease was prior to the Reynolds lease, that he took with notice of the claim of the defendant, and it is entitled to prevail. It is clear from the record that Ewald and the defendant, although they had negotiated with reference to a lease on these lands, had consummated no agreement at or prior to the time the lease and draft were sent to the bank in Denver. The defendant paid nothing to Ewald prior to his request to return the draft and lease. The defendant had requested an extension of time, which had been granted, within which further to examine the title, yet at no time had it communicated an acceptance to Ewald prior to his withdrawal of the offer to lease by requesting a return of the draft and lease. Ewald had made an offer to the defendant, but before defendant communicated its acceptance of the offer to him it had been revoked. This he had a right to do. (*Ide* v. *Leiser*, 10 Mont. 5, 24 Pac. 695, 24 Am. St. Rep. 17; sec. 7494, Rev. Codes.)

Defendant asserts that under a certain later agreement with respect to which Ewald and defendant had specific negotiations, it thereby acquired an interest in the lands which it may successfully rely upon as against plaintiff. Reynolds and Nadeau were not parties to these negotiations or agreements, if any. Having determined that the Reynolds lease was valid and subsisting at the time these transactions occurred, the testimony as to them was inadmissible and properly disregarded by the court. (Secs. 10509, 10510, Rev. Codes; *Kurth* v. *Le Jeune*, 83 Mont. 100, 269 Pac. 408.)

It is contended that Reynolds took with notice of the lease to the defendant under principles of law declared by our statute, section 8781, Revised Codes. But since we have determined that the lease to Reynolds was in effect at a prior time, any notice which Reynolds may have had of the later agreements was ineffectual to alter his rights. Plaintiff stands in the same position as Reynolds, for he could have no notice at the time Reynolds took title with reference to the so-called later agreement,

for the negotiations with reference to them occurred long after Reynolds acquired his lease. Plaintiff took whatever title Reynolds received, and whatever notice he may have had of these later agreements was ineffectual to diminish or affect the title which he received from Reynolds. In 2 Tiffany on Real Property, second edition, section 575, page 2257, it is said: "A purchaser for value may not only enjoy the property free from any adverse claim of which he had no notice at the time of his purchase, but he may also transfer his rights in this respect to others, and the fact that his alienee himself has notice is immaterial, it being thus the rule that a purchaser with notice from a purchaser without notice has all the rights of the latter, Were the rule otherwise, a purchaser without notice might be unable to dispose of his property for value." The foregoing quotation is supported by the following decisions: *Whitfield* v. *Riddle,* 78 Ala. 99; *White* v. *Moffett,* 108 Ark. 490, 158 S. W. 505; *Moore* v. *Allen,* 26 Colo. 197, 57 Pac. 698, 77 Am. St. Rep. 255; *Buck* v. *Foster,* 147 Ind. 530, 46 N. E. 920, 62 Am. St. Rep. 427; *East* v. *Pugh,* 71 Iowa, 162, 32 N. W. 309; *Varney* v. *Deskins,* 146 Ky. 27, 141 S. W. 411; *Barksdale* v. *Learnard,* 112 Miss. 861, 73 So. 736; *Craig* v. *Zimmerman,* 87 Mo. 475, 56 Am. Rep. 466; *McGrath* v. *Norcross,* 78 N. J. Eq. 120, 79 Atl. 85; *Bernard* v. *Benson,* 58 Wash. 191, 108 Pac. 439, 137 Am. St. Rep. 1051; *King* v. *Porter,* 69 W. Va. 80, 71 S. E. 202. Mr. Devlin in his work on Real Estate, third edition, section 747, page 1380, announces a like rule.

But was Reynolds a purchaser for value within the foregoing rule? "Value is any consideration sufficient to support a simple contract. An antecedent or pre-existing debt constitutes value." (Sec. 8432, Rev. Codes.) Clearly, under section 7503, Id., defining a good consideration, the promissory note given by Reynolds to Ewald was a good consideration and, therefore, a valuable consideration under section 8432; but we are reminded that Ewald returned the note to Reynolds. True, he did so more than a year after its original delivery to him. The

note was Ewald's property and he could dispose of it as he saw fit.

After the close of the taking of testimony the case was taken under advisement by the trial court. While it was thus pending a motion was made by the defendant to re-open the case for the taking of further testimony, which was denied before the findings of fact were made. The evidence sought to be introduced it is asserted would establish, first, that Johnson was the owner of an undivided one-half interest in the lease on which plaintiff rests his claim of ownership; second, that plaintiff was claiming under a new and modified lease. If, as contended, the testimony established beyond doubt that Johnson was the owner of the asserted interest in the lease, the result would not have been changed, as we have demonstrated. The offered testimony on the second point went no further than to show that a modified or new lease had been executed and delivered in escrow, but it was not offered to show at the time of the trial of the action, let alone at the commencement thereof, that the conditions of this escrow had been performed, and that at least until performed, the new or modified lease was not effective, as we have already herein decided.

The ruling on a motion to re-open a case is a matter within the sound discretion of the trial court, which will only be reversed on appeal for manifest abuse of this discretion. (*Gilcrest* v. *Bowen,* 95 Mont. 44, 24 Pac. (2d) 141; *State* v. *Whitcomb,* 94 Mont. 415, 22 Pac. (2d) 823.) The proposed testimony could not have changed the result, and hence there was no abuse of discretion in denying the motion.

Defendant argues that the trial court extended its findings and conclusions beyond the scope of the issues in the case. It is said that now plaintiff is claiming under the new lease filed of record since the trial and, as we understand, it is the one which was in escrow at the time of the trial. It is said that under the findings and decree the rights of the defendant might be unduly restricted by a plea of *res judicata* in future litigation. The lease in question was not before the court in this

case. On the record this lease was not effective at the time of the commencement of this action, and it was not within the issues here litigated. For the purpose of determining the operation and effect of a judgment as an estoppel the entire judgment-roll may be examined. Where the parties and matters to be determined are identical, the former adjudication is *res judicata* and conclusive, but in a second action, if it is upon a different claim or demand between the same parties, the judgment in the prior action operates as an estoppel only as to those matters or points actually litigated upon the determination of which the judgment was rendered. (*Brennan* v. *Jones,* 101 Mont. 550, 55 Pac. (2d) 697.) Hence the findings can only operate as to matters which were actually litigated on the trial of this case.

Error is assigned upon the refusal of the court to permit the defendant to show that the drilling obligation of the Reynolds lease had not been performed. The proof was attempted to be offered as a part of the cross-examination of one of plaintiff's witnesses. The testimony of this witness had not in any manner related to the subject of the inquiry; the ground of the objection was that it was not proper cross-examination. The objection was properly sustained upon the authority of *Spurgeon* v. *Imperial Elevator Co.,* 99 Mont. 432, 43 Pac. (2d) 891.

Lastly it is contended that the action should have been abated until all of the persons who had signed the unit and pooling agreement with the defendant for lands in the section in question were brought in as necessary parties to a complete determination of the controversy. (Sec. 9090, Rev. Codes; see, also, *McKenzie* v. *Evans,* 96 Mont. 1, 29 Pac. (2d) 657.) The controversy here was whether the lease of the defendant company was valid as against the plaintiff. No attempt was made to quiet the title of the plaintiff as against the whole world, or any other person than defendant. Plaintiff might have brought such an action, but he did not. It does not appear that plaintiff or his immediate predecessors in interest had any transactions with any of the other parties prior to the inception of his title by the execution and delivery of the Reynolds lease.

Hence, whatever rights may have been created by these negotiations and transactions between Ewald and the defendant, and between the latter and the various signers of this agreement, could in nowise affect the rights of the plaintiff and, therefore, they are not necessary parties to the settlement of the controversy litigated between plaintiff and defendant.

We expressly and specifically disclaim any responsibility whatever for all of the remarks, statements, observations and conclusions found in the special opinion filed in this cause by the Chief Justice of this court.

Judgment affirmed.

ASSOCIATE JUSTICES STEWART, MORRIS and ANGSTMAN concur.

Rehearing denied June 26, 1937.

ON MOTION TO STRIKE SPECIAL CONCURRING OPINION FROM FILES.

(Opinion filed June 7, 1937.)

Opinion: PER CURIAM.

On May 26, 1937, this court delivered an opinion affirming the judgment of the district court herein. The Chief Justice, concurrently with the promulgation of this opinion, delivered a special opinion in the case which did not disagree with the result announced in affirming the judgment in that case, but proceeded further than the majority opinion and concluded by finding the defendant and each of its attorneys guilty of contempt of this court arising out of the presentation of the cause to this court and the conduct of the course of this litigation, and proceeded to attempt to impose a fine and punishment for such contempt upon the defendant in the sum of $25,000, and additional fines on the counsel of $10,000 each, although the maximum fine which may be imposed under the statute for contempt is the sum of $500 (sec. 9917, Rev. Codes). All the members of this court, aside from the Chief Justice, subscribed to the

opinion of the court declaring that they disclaimed all responsibility for the remarks, observations, statements and conclusions appearing in the special opinion of the Chief Justice.

Now, the attorneys for the defendant have, as individuals and on behalf of their client, filed in this court a motion praying that the special opinion be stricken from the files of the court upon numerous grounds, among which it is asserted that such opinion is "scandalous, scurrilous and defamatory."

It may be observed, in passing, that at the time of the argument of the cause, neither did the parties nor their attorneys, nor any member of the court, suggest that any contempt had been committed, or was being or was about to be committed. The matter of contempt was not then considered by anyone unless it was by the Chief Justice, and if so considered by him, he kept his own counsel until long after the conclusion of the argument of the cause and until the conclusion of the deliberation on the case by this court.

Epithets and adjectives are applied to the defendant and its attorneys whereby they are charged with crimes, unprofessional and immoral conduct. To here set forth these various expressions verbatim would be but to perpetuate them upon the records of this court, and if the motion were then granted, its actual purpose would thereby be destroyed. Without question, the words used in the opinion of which complaint is made by the movents are scandalous, scurrilous and defamatory. The question is thus presented: May we grant the motion in the light of this situation?

Preliminary to the consideration of this question, the inquiry is suggested, May the movents secure relief under the laws relating to libel? A publication is privileged when made "in any judicial proceeding." (Sec. 5692, Rev. Codes.) An unbroken line of judicial decisions by the English and American courts adheres to the rule that no action will lie against a judge for acts done, or words spoken in his judicial capacity in a court of justice. Judges, when acting in a judicial capacity, are absolutely immune from responsibility for slander or libel. (New-

ell on Slander & Libel, 3d ed., secs. 517, 518; *Mundy* v. *Mc-Donald*, 216 Mich. 444, 185 N. W. 877, 20 A. L. R. 398; see cases collated in note, 20 A. L. R. 407; also, article in 9 Columbia Law Review, pp. 463 and 600.)

The reason for this rule of law was very well expressed by the English court in the case of *Scott* v. *Stanfield*, (1868), L. R. 3 Exch. 220, 15 Eng. Rul. Cases, 42: "This provision of the law is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences."

Having determined that the movents are without right to secure relief under the law under the subject of libel, some suggestions are made as to relief possible in such a situation as we have here at hand, in the article in the Columbia Law Review, supra, from which we now quote as follows: "Moreover, underlying this whole doctrine of absolute immunity is the conception of an alternative remedy. Although the law, for reasons of public policy, denies an action for defamation, the occasions to which immunity applies almost always afford other remedies, which minimize, if indeed they do not always afford adequate relief for, the damage which a person defamed may have sustained. Of course, these remedies are not uniformly available in all cases; in some instances they are almost entirely lacking; but it is hardly possible to conceive of a case in which there is no recourse of any kind against abuse. In the case of judicial proceedings, in which the rule of immunity has the widest scope, the underlying idea is that there is a tribunal whose proceedings are governed by formal methods specially designed for the orderly and efficient performance of the functions of those who participate in them; a tribunal presided over by a judge or judicial officer, specially equipped for his duties by character, learning and experience, who has the power, and, presumably, the will, to regulate and discipline all those who participate or appear before him. Judicial procedure implies notice to persons in interest, with the right to appear in person and by wit-

nesses in answer to any charges that may be made, and the right to a formal judgment by an impartial court and jury. If a judge forgets his duty and demeans his high office he may be impeached and removed. Jurors, witnesses, counsel and parties litigant who overstep the bounds of decorum may be reprimanded, fined or punished by imprisonment, and the defamatory utterance may be expunged from the record. It is true that punishment for contempt is in theory punishment for an indignity offered to the court, rather than reparation to the aggrieved person for the injury sustained by him. But it is a matter of common observation that in the proper exercise of his powers by a judge, the malicious abuse of their functions by parties, witnesses or counsel harms them rather than the object of their malice. Offending counsel may be disbarred, and, like judges, suspended from the exercise of their office.''

Since no other adequate relief is afforded to movents, it becomes most important for us to determine whether any relief may properly be afforded by granting their motion and thereby prevent the perpetuation of this document among the records of this court, as well as its publication in its reports and other law reports.

A careful search has revealed no case in the annals of American Jurisprudence where a judge of the highest appellate court of any jurisdiction has had his judicial utterance called in question in this manner, nor have we found a similar case in the English reports. The courts have, however, on occasion spoken upon the subject of keeping their records free from stain and scandal. ''Scandal'' is an unnecessary statement which bears cruelly upon the moral character of an individual, or the statement of anything which is contrary to good manners, or anything which is unbecoming the dignity of the court to hear. (*Kelley* v. *Boettcher*, 85 Fed. 55.) In the case of *Green* v. *Elbert*, 137 U. S. 615, 624, 11 Sup. Ct. 188, 34 L. Ed. 792, Mr. Chief Justice Fuller, speaking for the court, said: ''We regret that we find ourselves compelled to add something further. The printed argument of plaintiff in error contains many allegations

wholly aside from the charges made in his complaint, and bearing reproachfully upon the moral character of individuals, which are clearly impertinent and scandalous, and unfit to be submitted to the court. It is our duty to keep our records clean and free from scandal.''

Again, Chief Justice White, in delivering the opinion for the court in the case of *Royal Arcanum* v. *Green*, 237 U. S. 531, 546, 35 Sup. Ct. 724, 59 L. Ed. 1089, L. R. A. 1916A, 771, said: ''Before making the order of reversal we regret that we must say something more. The printed argument for the defendant in error is so full of vituperative, unwarranted and impertinent expressions as to opposing counsel that we feel we cannot, having due regard to the respect we entertain for the profession, permit the brief to pass unrebuked or to remain upon our files and thus preserve the evidence of the forgetfulness by one of the members of this bar of his obvious duty. Indeed, we should have noticed the matter at once when it came to our attention after the argument of the case, had we not feared that by doing so delay in the examination of the case and possible detriment to the parties would result. Following the precedent established in *Green* v. *Elbert,* 137 U. S. 615, 11 Sup. Ct. 188, 34 L. Ed. 792, which we hope we may not again have occasion to apply, the brief of the defendant in error is ordered to be stricken from the files.''

In the case of *Morrison* v. *Snow,* 26 Utah, 247, 262, 72 Pac. 924, it is declared: ''The issue thus raised is, Has a court power to expunge from its files and records, scandalous, malicious and malignant matter injected therein, that raises no issue and can serve no purpose, except to harass, annoy, wound the feelings, and besmirch the reputation of the parties at whom it is aimed? In other words, must the doors of the judiciary be thrown wide open, and become a conduit through which the malevolence, vindictiveness, and offensive personalities of litigants and attorneys may be injected, and the files, records and vaults of the courts become the public repositories in which to perpetuate such scandal? Every court has the inherent power to prevent

libelous, impertinent and scandalous matter from incumbering its records. It would, indeed, be a sad commentary on our judicial system, if courts were powerless to enforce proper decorum in all proceedings before them, and compel litigants and attorneys to observe the rules of propriety and common decency in the bringing and conducting of suits."

The Court of Appeals of West Virginia, in the case of *Johnson* v. *Brown*, 13 W. Va. 71, 135, said: "The court may at any time have stricken from the record scandalous matter, though it refer to a stranger to the suit, either at the instance of such stranger, or without any motion by anyone. The court of its own motion, in aid of public morals, is bound not to permit its records to be made the means of perpetrating libelous and malignant slanders, but should interfere to suppress such indecencies, which may stain the reputation and wound the feelings of the parties, their relatives and friends."

Judge Sanborn of the Circuit Court of Appeals for the Eighth Circuit in delivering the opinion of the court in the case of *Kelley* v. *Boettcher*, supra, said: "The authority and the duty of a federal court to keep its records free from stain and scandal are by no means dependent on the ability or disposition of counsel for the litigants before it, but its power is plenary, and its duty imperative, whatever the action of counsel may be." (See, also, *Huffman* v. *State*, 183 Ind. 698, 702, 109 N. E. 401, 748; *Pittsburgh C. C. & St. L. Ry. Co.* v. *Muncie & P. Traction Co.*, 166 Ind. 466, 77 N. E. 941, 9 Ann. Cas. 165, 166, and note on page 166; *Brownell* v. *McCormick*, 7 Mont. 12, 35 Pac. 108; *Diamond T. G. & S. Min. Co.* v. *Faulkner*, 17 Colo. 9, 28 Pac. 472; *Zukas* v. *Appleton Mfg. Co.*, 277 Ill. 87, 115 N. E. 164.)

We fully subscribe to the doctrine announced in the foregoing cases as applied to the facts here under consideration. It, therefore, becomes our unpleasant duty to afford to the movents some relief. The motion to strike the opinion is granted accordingly.

Our associate has the right to speak freely within the record of the case. If he so desires he, of course, can file such special

opinion as to him may seem fit and proper. But it is the duty of this court to keep its files and records free from stain and scandal not pertinent to the cause and unnecessary to a decision, and when those injured, or others on their behalf, ask for relief therefrom it should be granted.

It is, therefore, ordered that the special concurring opinion filed in this cause be stricken from the files of this court and the same expunged from its records, and that it be not published in the reports of the decisions of this court.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concurring.

MR. JUSTICE ANGSTMAN: I dissent. While I am unable to agree with what the Chief Justice has said in his opinion, yet it is the opinion of one member of the court who is as firmly convinced that the record justifies his statements as the rest of us are that it does not. He thinks his remarks are pertinent to the case and warranted by the record. The rest of us think they are not.

I know of no law, rule or regulation of any kind, nor have I been able to find a precedent for this most extraordinary proceeding,—whereby a majority of the court can control the thoughts or acts of another member of the court. Whether right or wrong, whether justifiable or not, I think each member of this court has the right to think as he pleases and to express his thoughts in a written opinion uncontrolled by the others. This court just recently, when dealing with the acts and conduct of the Governor, called upon Voltaire's comment upon the statement of another: "I wholly disapprove of what you say, but will defend to the death your right to say it." (*State ex rel. Matson* v. *O'Hern*, 104 Mont. 126, 65 Pac. (2d) 619.)

I believe that while we may possess the power, we have not the right to stay the hand of the Chief Justice to write what he thinks in the course of judicial proceedings. Any other rule in my opinion establishes a dangerous precedent. Here it is sought to strike out the whole of the opinion of the Chief Justice.

Some parts of it are unobjectionable, and for us to strike out the objectionable matter, leaving the rest to be published, is tantamount to writing an opinion for him, and one which only partially expresses his views.

As much as I dislike to see published in the Montana Reports as a permanent record what I believe is an unwarranted criticism of the conduct of counsel involved, yet I think it is a usurpation of power for the majority of this court to deny to another member of the court his right freely to express his views, and to have them recorded as a part of the court's opinion.

I agree with the rules announced in the cases cited in the majority opinion to the effect that the courts may keep their records free from stain and scandal, but those cases have to do with scandalous matter injected by counsel in the case, or by others than a member of the court. None of them have to do with scandalous matter injected by a member of the court. Court records are made by members of the court, and I think each member of the court has the right to participate in making the record. I think, therefore, it is error on the part of the majority to strike the opinion of the Chief Justice. I am prompted to take this view, not because of a desire to see that opinion published, nor because I think it is justified by the record, but solely on the ground that I think each member of this court has the right to express his opinion in cases presented to the court and thus to participate in making the court records.