**OXLEY et al. v. SWEETLAND.**

**No. 4220.**

Circuit Court of Appeals, Fourth Circuit.

Jan. 4, 1938.

34

Henry W. Anderson, of Richmond, Va., and Fred O. Blue, of Charleston, W. Va. (Russell W. Morris, of Huntington, W. Va., John F. Ellison, Homer Blizzard, and Charles M. Love, all of Charleston, W. Va., H. L. Ducker, of Huntington, W. Va., Blue, Dayton & Campbell, of Charleston, W. Va.,

and Hunton, Williams, Anderson, Gay & Moore and Wirt P. Marks, Jr., all of Richmond, Va., on the brief), for appellants.

Charles L. Estep, of Logan, W. Va., and T. C. Townsend, of Charleston, W. Va. (Ira P. Hager, of Logan, W. Va., and W. W. Barrett, of Pikeville, Ky., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This suit was instituted against the administratrix and the various next of kin of Louis R. Sweetland, deceased, late of Hamlin, West Virginia, by plaintiff who claims to be his widow, the purpose of the suit being to determine the right of plaintiff to the personal property of the deceased. Process was served upon those of the next of kin who resided in West Virginia but was not served upon a number residing in other states. A motion to dismiss was sustained as to the nonresident defendants, but was overruled as to the others, who filed answer denying that plaintiff had been married to decedent or was entitled to any part of his property. They pleaded also, as an estoppel against plaintiff, the proceedings for partition of decedent's real estate had in the circuit court of Cabell county, West Virginia, in which it had been adjudicated that there had been no marriage between decedent and plaintiff and that plaintiff was entitled to no share in his real estate. It appeared, however, that the plaintiff had been made a party to the partition proceedings only by service of notice beyond the court's jurisdiction; and this portion of the answer was accordingly stricken, as not constituting matter of defense.

The court below found, after hearing, that plaintiff had been lawfully married to decedent and as his widow was entitled to his personal property. Decree was accordingly entered to that effect as against the resident defendants, excepting, however, from its terms the portion of the property claimed by the nonresidents, and providing that nothing contained therein should in any manner prejudice their rights. Three questions are raised by the appeal: (1) Whether the court had jurisdiction of the cause in the absence of the nonresident defendants; (2) whether the estoppel pleaded in the answer of defendants should have been stricken; and (3) whether the decree was correct upon the merits.

On the first question, it is to be remembered that the suit is one to determine the rights of the parties before the court in the personal property of the decedent. If plaintiff was married to decedent, as she contends, that property, subject to debts and charges of administration, belongs to her. If there was no marriage, it belongs to his surviving brothers and sisters and to the descendants of such as died before he did. Code of W.Va. c. 42, art. 1, § 1, and article 2, § 1; Kennedy's Adm'r v. Kennedy, 97 W.Va. 491, 125 S.E. 337. The fact of marriage is a necessary issue in this suit of plaintiff; but the purpose of the suit is, not to establish the marriage, but to determine the right to the property claimed as against adverse claims of the defendants. As such, it is one of which the federal courts have jurisdiction, diversity of citizenship and the jurisdictional amount being present. Payne v. Hook, 7 Wall. 425, 19 L.Ed. 260; Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 34, 30 S.Ct. 10, 14, 54 L.Ed. 80; McClellan v. Carland, 217 U.S. 268, 269, 30 S.Ct. 501, 54 L.Ed. 762; Riehle v. Margolies, 279 U.S. 218, 225, 49 S.Ct. 310, 313, 73 L.Ed. 669; Cottingham v. Hall, 4 Cir., 55 F.2d 664; Hall v. Cottingham, D.C., 55 F.2d 659. The only jurisdictional question which can arise, therefore, relates to the failure to bring in as parties those of the next of kin upon whom service of process could not be obtained; and we think that the court properly ruled in favor of the jurisdiction, since it is possible to determine the controversy as to the portion of the property in dispute between the parties before the court and by appropriate orders to protect the rights of those whom it was impossible to make parties.

Revised Statutes, § 737, Jud.Code, § 50, 28 U.S.C.A. § 111, provides: "When there are several defendants in any suit at law or in equity, and one or more of them are neither inhabitants of nor found within the district in which the suit is brought, and do not voluntarily appear, the court may entertain jurisdiction, and proceed to the trial and adjudication of the suit between the parties who are properly before it; but the judgment or decree rendered therein shall not conclude or prejudice other parties not regularly served with process nor voluntarily appearing to answer; and non-joinder of parties who are not inhabitants of nor found within the district, as aforesaid, shall not constitute matter of abatement or objection to the suit."

And an even broader provision is contained in the Thirty-Ninth Equity Rule, 28 U.S.C.A. following section 723, which is as follows: "In all cases where it shall appear to the court that persons, who might otherwise be deemed proper parties to the suit, cannot be made parties by reason of their being out of the jurisdiction of the court, or incapable otherwise of being made parties, or because their joinder would oust the jurisdiction of the court as to the parties before the court, the court may, in its discretion, proceed in the cause without making such persons parties; and in such cases the decrees shall be without prejudice to the rights of the absent parties."

Referring to this statute and rule in the leading case of Waterman v. Canal-Louisiana Bank & Trust Co., supra, the Supreme Court said:

"This statute and rule permit the court to proceed with the trial and adjudication of the suit, as between parties who are properly before it, and preserves the rights of parties' not voluntarily appearing, providing their rights are not prejudiced by the decree to be rendered in the case. This rule has been said to be declaratory of the already-established equity practice. Shields v. Barrow, 17 How. 130, 15 L.Ed. 158; 1 Street, Fed.Eq.Pr. § 533, and cases there cited. This rule does not permit a Federal court to proceed to a decree in that class of cases in which there is an absence of indispensable, as distinguished from proper, or even necessary, parties, for neither the absence of formal, or such as are commonly termed necessary, parties, will defeat the jurisdiction of the court; provided, in the case of necessary parties, their interests are such and so far separable from those of parties before the court, that the decree can be so shaped that the rights of those actually before the court may be determined without necessarily affecting other persons not within the jurisdiction. After pointing out that there may be formal parties, of whose omission the court takes no account, Mr. Justice Miller, in delivering the opinion in Barney v. Baltimore, 6 Wall. 280, 18 L.Ed. 825, went on to say: 'There is another class of persons whose relations to the suit are such that, if their interest and their absence are formally brought to the attention of the court, it will require them to be made parties, if within its jurisdiction, before deciding the case; but, if this cannot be done, it will proceed to administer such relief as may be in its power between the parties before it. And there

is a third class whose interests in the subject-matter of the suit and in the relief sought are so bound up with that of the other parties that their legal presence as parties to the proceeding is an absolute necessity, without which the court cannot proceed. In such cases the court refuses to entertain the suit when these parties cannot be subjected to its jurisdiction.'

"The relation of an 'indispensable party to the suit must be such that no decree can be entered in the case which will do justice between the parties actually before the court without injuriously affecting the rights of such absent party. 1 Street, Fed. Eq.Pr. § 519.

"If the court can do justice to the parties before it without injuring absent persons, it will. do so, and shape its relief in such a manner as to preserve the rights of the persons not before the court. If necessary, the court may require that the bill be dismissed as to such absent parties, and may generally shape its decrees so. as to do justice to those made parties, without prejudice to such absent persons. Payne v. Hook, 7 Wall. 425, 19 L.Ed. 260."

We see no reason why the court cannot determine, as between plaintiff and those of the next of kin who have been made parties, the right to that portion of the property claimed by such next of kin, without determining the right to the portion claimed by the others. · It is true that in making the determination the court must pass upon a question of fact in which the absent claimants are interested, but their rights in the property will be in no manner affected by the determination or finding, which will be binding only upon the parties before the court. If the situation were reversed so that plaintiff as claimant of the entire property were being sued by one of the nonresident next of kin to establish rights in the property, it would hardly be contended that the court would lack jurisdiction because all of the other next of kin were not parties. See Payne v. Hook, supra. We see no difference in the principle to be applied because the one claiming the entire property is the plaintiff instead of the defendant. In either case, it is only the interest which is in controversy between the parties before the court which can be adjudicated, and in neither can anything be done which will affect the interest of adverse parties or result in a situation inconsistent with equity or good conscience. Any other holding would greatly and unnecessarily narrow the jurisdiction of the federal courts in a class of cases where the maintenance of their jurisdiction is of the utmost importance.

The case is ruled we think by the case of Waterman v. Canal-Louisiana Bank & Trust Co., from which we have quoted, supra. In that case the complainant was contending that certain legacies under a will had lapsed, that she as one of the next of kin of testator was entitled to the legacies, and that others of the next of kin were estopped by taking benefits under the will from making any claim to them. One of the next of kin as to which this contention was made could not be joined as a party because beyond the reach of process; and the contention was made that his absence defeated the jurisdiction of the court, since he was an adverse claimant of a part of the fund in controversy. It was held, however, that the court could proceed with respect to the interest of the parties before it, reserving the rights of the absent claimant by appropriate order. In holding that the latter was not an indispensable party to a suit in which the entire fund was claimed by plaintiff, but that his interest should be protected by the court for adjudication in some other suit, the court said:

"We are of opinion that the presence of Frederick T. Davis as a party to the suit is not essential to the jurisdiction of the Federal court to proceed to determine the case as to the parties actually before it. In other words, that while Davis is a necessary party in the sense that he has an interest in the controversy, his interest is not that of an indispensable party, without whose presence a court of equity cannot do justice between the parties before it, and whose interest must be so affected by any decree to be rendered as to oust the jurisdiction of the court.

"With the parties before it the court may proceed to determine whether, because of the acts alleged in the bill, the heirs at law of Mrs. Tilton were entitled to recover because of the lapsed legacy. If it finds the issue in favor of the complainant, it may proceed to determine the proportion in which the complainant and the Watermans are entitled to share, without prejudice to the rights of Davis. It may direct the retention of his share in the hands of the executors, to be adjudicated in some other suit, or may otherwise shape its relief so as to do justice to the parties before the court without affecting his interest."

See, also, Elmendorf v. Taylor, 10 Wheat. 152, 166, 6 L.Ed. 289; Harding v. Handy, 11 Wheat. 103, 133, 6 L.Ed. 429; Horn v. Lockhart, 17 Wall. 570, 579, 21 L. Ed. 657; McClellan v. Carland, 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762; United Shoe Machinery Corporation v. United States, 258 U.S. 451, 456, 42 S.Ct. 363, 364, 66 L.Ed. 708; Bourdieu v. Pacific Oil Co., 299 U.S. 65, 70, 71, 57 S.Ct. 51, 53, 81 L.Ed. 42; West v. Randall, 29 Fed.Cas. pp. 718, 723, No. 17,424, 2 Mason 181; Van Bokkelen v. Cook, Fed.Cas.No.16,831, 5 Sawy. 587; Williams v. Crabb, 7 Cir., 117 F. 193, 59 L.R.A. 425; North Carolina Mining Co. v. Westfeldt, C.C., 151 F. 290, 296; Thomas v. Anderson, 8 Cir., 223 F. 41, 43; Atwood v. Rhode Island Hospital Trust Co., 1 Cir., 275 F. 513, 517–519, 24 A.L.R. 156; Edenborn v. Wigton, 5 Cir., 74 F.2d 374; Seeley v. Cornell, 5 Cir., 74 F.2d 353; Hughes Federal Practice Vol. 7, p. 124, § 4296; Cyclopedia of Federal Procedure Vol. 3, p. 241.

An attempt is made to distinguish the Waterman Case on the ground that the estoppels there relied upon consisted of separate acceptances of benefits under the will by the various next of kin; but this furnishes no valid ground of distinction since the complainant there, as here, was claiming the entire property in controversy and not merely severable shares therein. It was the fact that the rights of the absent defendant could be preserved without prejudice while the court was determining the rights of the parties before it that was the basis of that decision, not the fact that the absent defendant might not be estopped in the same way as the other heirs at law. That the attempted distinction is not valid becomes clear, when consideration is given to the cases in which a plaintiff suing to establish rights in property in the hands of an executor, administrator, or trustee fails to join other persons having a similar interest and claiming under the same right, such as Payne v. Hook, Harding v. Handy, Horn v. Lockhart, Williams v. Crabb, or Edenborn v. Wigton, heretofore cited. As heretofore indicated, there can be no reason for holding that such persons are indispensable parties where the one claiming the entire estate is plaintiff but not if he is defendant.

■ The thing that makes one an indispensable party to a suit is that some interest of his will be affected by it, not that questions of law or fact will be passed upon in which he is interested but by the decision of which he will not be bound. Thus, in Shields v. Barrow, 17 How. 130, 15 L.Ed. 158, the absent parties held indispensable had an interest under a contract which it was the purpose of the suit to annul and set aside. The action of the court sought by the bill would, of course, have affected their interest. Barney v. Baltimore City, 6 Wall. 280, 18 L.Ed. 825, was a suit for partition of real estate in which the absent parties had an interest and which could not be partitioned without affecting that interest. In Niles-Bement-Pond Company v. Iron Moulders' Union, Local No. 68, 254 U.S. 77, 41 S.Ct. 39, 65 L.Ed. 145, the nonresident party was a corporation which had entered into contracts with plaintiff and plaintiff was seeking to enjoin action of third persons which would interfere with the performance of these contracts. Where no interest of the absent parties will be determined by the suit and no action can be taken by the court which would make a determination in their favor contrary to equity and good conscience, there is no reason why the court should not proceed to determine the rights of the parties before it, even though in doing so it may decide questions of fact or law in which absent parties are interested. If this were not true, every person having any interest in the determination of a question of law or fact would be an indispensable party to every suit in which such question might be brought in issue, a manifest absurdity.

■■ On the second question raised by defendants, i. e. the striking of their plea of estoppel, little need be said as it is perfectly clear that the plea was properly stricken. It appears that plaintiff was not served with process in the state of West Virginia in the partition suit and did not enter any appearance in that suit. Notice of its pendency was served upon her in North Carolina pursuant to the provisions of the West Virginia statute, Code 1931, c. 56, art. 3, § 23; but this of course was mere substituted service and had no other effect than to subject the land in West Virginia to the court's jurisdiction. It did not subject plaintiff personally to the jurisdiction, and findings made and judgment entered in the cause were binding, not upon her personally, but merely upon the property which was the subject of that litigation. Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565; Freeman v. Alderson, 119 U.S. 185, 7 S.Ct. 165, 30 L. Ed. 372; Harris v. Weed, 89 Conn. 214, 93

A. 232; Picquet v. Swan, 19 Fed.Cas. pp. 609, 612, No. 11,134, 5 Mason 35. As said by Mr. Justice Story in the case last cited (quoted with approval by the Supreme Court in Pennoyer v. Neff, supra): "Where a party is within a territory, he may justly be subjected to its process, and bound personally by the judgment pronounced, on such process, against him. Where he is not within such territory, and is not personally subject to its laws, if on account of his supposed or actual property being within the territory, process by the local laws may by attachment go to compel his appearance, and for his default to appear, judgment may be pronounced against him, such a judgment must, upon general principles, be deemed only to bind him to the extent of such property, and cannot have the effect of a conclusive judgment in personam, for the plain reason, that except so far as the property is concerned, it is a judgment coram non judice."

■■ We come, then, to the third question presented by the appeal, which is the correctness of the decree upon the merits; and the question here is whether decedent was married to plaintiff at Pikeville, Kentucky, on February 24, 1934. It is not disputed that a marriage ceremony was performed there at that time between plaintiff and a man who was represented to the officiating minister as being the decedent Louis R. Sweetland; but defendants deny that this person was in fact decedent, who was an aged man in failing health, and contend that the marriage ceremony was a step in a conspiracy on the part of plaintiff and other persons to lay claim to a part of his estate. The burden of proof rests, of course, upon plaintiff to establish her marriage to decedent; and, as she has waited until after decedent's death to assert the marriage, the burden is a heavy one. We do not think that she has met it.

The plaintiff is a young woman. In applying for license to marry decedent she represented her age as 33 years, although in applying for a position as school teacher a month later she claimed to be only 28. There is some question about her name. Her maiden name was Stratton, although she seems to have pretended from time to time during the eight years preceding her marriage that she was Mrs. Nellie Cotyatton, wife of Gerald Rexford Cotyatton. She testified below that this marriage to Cotyatton was a pure fiction, that there was no such person as Cotyatton, and that she was pretending to be married because she had become pregnant in the year 1929 and wished to conceal her shame. She gives this explanation also for beginning a divorce suit against Cotyatton at that time, although it appears that she had been signing papers two years or more beforehand in the name of Cotyatton. She lived in the town of Logan, West Virginia, where in 1930 she had given birth to an illegitimate child and had instituted a bastardy proceeding against a citizen of that community which had been decided against her. At the time of the alleged marriage she was operating a "beauty shop" in the town of Logan in partnership with one Hull, who operated a similar shop in the city of Huntington, some seventy-five miles distant.

Decedent, on the other hand, was an aged man of high character and standing in the town of Hamlin, West Virginia, distant about 50 miles from Logan and about 30 from Huntington. He was a banker and business man and was described as a gentleman of the old school, very careful and conservative, who had accumulated over a long lifetime a considerable fortune, said in the complaint to be of the value of approximately two million dollars. He had reached 75 years of age, was a bachelor and for two years had been in failing health. He had lived for twelve years with a sister in Hamlin and was still living there when he died on October 23, 1934, eight months after the alleged marriage. None of his friends, relatives, or business associates, so far as the record shows, ever heard of the marriage until after his death when plaintiff showed up claiming to be his widow as he was lying a corpse in the home where he had lived with his sister. Plaintiff attempts to explain her delay in claiming the status of a wife by saying that decedent desired that the marriage be kept secret for a while on account of business matters and his relationship with his sister and other relatives; but why a man of his wealth and influence would have desired that his marriage to the woman that he had chosen for a wife be kept secret does not satisfactorily appear. The fact that plaintiff made no public claim to being his wife when he was living and in position to deny the claim subjects her entire story to the gravest suspicion. It is hard to believe that, if she had been married to him as she contends, anything could have prevented her from asserting the marriage in the presence of his relatives and having him confirm it to them while he was in position to do so. We are not dealing with the

case of a simple trusting girl who has been imposed upon, but with the case of an educated and experienced woman on the one hand and an aged and infirm man of large wealth on the other; and it is simply unbelievable that for the purpose of protecting the feelings of the man's sister such a woman would have put herself in the compromising position of being married by a secret marriage when she had only to speak out to put herself in a position of security.

Plaintiff's version of the events leading up to the marriage does not add to but rather detracts from the credibility of her story. According to her statement, she had never seen decedent until the summer of 1933, when she sought his aid in securing a teaching position in his county. She claims that she went to see him four or five times at his bank and that on the fifth visit he asked her to marry him but that she declined to do so then because she was suffering at the time from whooping cough. She says that she met him several times at Huntington prior to February 24th, but fixes no time with any definiteness except the time when the marriage was agreed on, which she says was the evening of February 17th. The fixing of this date, however, was unfortunate; for the evidence shows quite definitely, we think, that defendant was at Hamlin attending a meeting of the Masonic Lodge at the very time that plaintiff claims he was in Huntington proposing marriage to her. Plaintiff testifies that a number of notes were exchanged between her and decedent; but no such notes are produced and the only corroboration of her testimony with regard thereto is the testimony of one Hull with whom she was in partnership in the operation of her "beauty shop." That a gentleman of the old school, a banker, and a cautious man, should make love to a woman who had given birth to an illegitimate child and had prosecuted an unsuccessful bastardy action in the courts, that he should propose marriage on the fifth meeting with such a woman, and that he should carry on a correspondence with her by means of notes sent through a "beauty shop" operator instead of by the ordinary process of the mails, is a little too much to ask a court to believe.

And the same is true of plaintiff's version of the marriage. She contends that, without making any plans or arrangements for the wedding and without even deciding where it was to take place, decedent came unattended to Huntington to meet and marry her; that immediately upon his arrival in Huntington he got without question into a small automobile coupé and drove with her and her sister, crowded into one seat, one hundred miles or more over a rough mountain road on a cold and snowy February day to a remote mountain village to be married, stopping on the way to buy a hat for the occasion; that upon arrival at the scene of the wedding, he did not purchase the marriage license or arrange with the minister to perform the ceremony, but allowed these matters to be attended to by plaintiff herself; and that after the wedding he drove with her back to Huntington, spent the night with her at the Huntington Hotel, and left her the next morning, going back to Hamlin to his bank and letting her go back to Logan to the operation of her "beauty shop." This was certainly strange conduct all around—strange that an elderly, cautious man of his character should be willing to be married in any such fashion—strange that a woman who knew her way about in the world, to say the least of it, should be willing to go back to running a beauty shop when she had just married one of the wealthiest men of the state. And the credibility of the story is not heightened by the fact that the only companion of plaintiff and decedent on this strange wedding journey was plaintiff's sister, who had been living in adultery and who falsely signed the name of another person instead of her own name as a witness of the marriage. Nor is the credibility of the story enhanced by the failure to produce a single witness other than the sister to corroborate plaintiff's statement that she and decedent spent the night following the wedding at the Huntington Hotel. Decedent was well known in Huntington and his staying at the hotel with a woman would most certainly have attracted attention.

And the conduct of the parties between the alleged marriage and the death of decedent casts further doubt upon plaintiff's story. She contends that she and decedent spent a number of nights together during this period at the leading Huntington hotels, but no witness is produced who saw them at any of the hotels on a single occasion. She claims to have stayed with him twice at the home of her mother and on several occasions at the apartment occupied by her partner Hull and his wife; but the records of the Masonic Lodge show that he was present at lodge meetings in Hamlin on the only date and at the time positively fixed with reference to the Hull apartment and

on one of the two dates and at the time fixed with reference to plaintiff's mother's home. Plaintiff continued to operate her "beauty shop," although she claims to have had a miscarriage in the spring of 1934 and to have developed tuberculosis a little later on; and on the month following the marriage she filed an application for a position as school teacher, in which she described herself as "single." Decedent executed two modifications of leases covering gas rights in real estate in April following the alleged marriage, in both of which he also described himself as "single." Although plaintiff and decedent were living in different towns during this period, she produces not a single letter from him and she cannot produce a single gift that he made her during the entire period. She and her partner Hull and his wife testify that the defendant gave her a ring and took it back to have it cut down to fit her, but it was not produced or its absence otherwise accounted for. She testified that he gave her money from time to time, but she is vague as to the amount, and there is no further evidence as to the matter except the testimony of her sister to the effect that when the sister was in the hospital decedent visited her and gave her ten dollars in cash to send plaintiff. The story of a man of wealth allowing a sick wife to whom he had just been married to continue to operate a "beauty shop" and apply for a position as school teacher, and of his sending her the sum of ten dollars by the hand of a third person, is a story that does not carry conviction. And it is simply unbelievable that plaintiff would have acquiesced in such treatment if she had really been married to decedent. Almost any woman would have demanded the proper support to which she was entitled under such circumstances; and it is hardly to be supposed that a woman who had not quailed from seeking her supposed rights in a bastardy proceeding would shrink from invoking her rights as a wife of one of the wealthier citizens of the community. The fact that she did not make such claim when the decedent was alive to dispute it is the strongest sort of proof that it is without foundation in fact.

All of the matters above referred to tend to discredit the plaintiff's story and make it difficult to accept, even in the absence of any contradictory testimony on the part of the defense. When that testimony is considered, however, any vestige of doubt as to the falsity of plaintiff's story is removed; for it establishes beyond preadventure, we

think, that decedent was in Hamlin during the entire day of February 24, 1934, and could not therefore have been the person with whom plaintiff went through the marriage ceremony. Fifteen witnesses, most of them apparently disinterested and corroborated in large measure by records made at the time, account for decedent's presence during every hour of the day and far into the evening of the day in question. Letters, bank records, a canceled note, and sundry other writings and records leave no doubt in our minds as to the truthfulness and correctness of their testimony.

The learned judge below gave great weight to the testimony of the officiating minister and his wife, but we do not think that, properly considered, their testimony has great probative value. While they were doubtless honest in their attempted identification of decedent, it is to be remembered that they saw the man for whom the marriage ceremony was performed for only a few moments and did not see decedent until eight months later after he had been dead for some time, and saw him then lying in a casket under artificial light. When asked to describe the man whom he married, the minister described him as being about 60 years of age, 5 feet 8 or 9 inches tall, weighing about 160 pounds, and having two-tone hair of bluish appearance with bluish spots on the bald part of his head. Decedent was a man 75 years of age, in failing health and very thin, with snow-white hair and fair scalp and no spots on the scalp of any sort. The minister expressly denied noticing that the man whom he married had any peculiarity of voice, whereas it was shown that decedent had a high feminine voice, a peculiarity which would undoubtedly have been noticed if he had been the man who took part in the ceremony. All that the minister would say when shown the man in the casket was, "If it was not the man it was a good likeness of him," and when pressed on the stand to express an opinion as to identity, would go no farther. His wife said that she felt that the man in the casket was the man who was married and referred to the blue spots on the head of the latter. This sort of identification, supported by no more than the testimony of plaintiff and her sister, cannot prevail against the positive testimony of disinterested witnesses who knew decedent well and place him in Hamlin at the time that the marriage ceremony was taking place. There was some testimony to the effect that decedent was seen with plaintiff at Logan on several occasions aft-

er the alleged marriage. Most of this, however, came from witnesses connected with plaintiff in various ways, and the rest was of little probative value.

For the reasons stated, we think that the decree appealed from must be reversed and decree entered for the defendants. While it is true that the findings of the court below are given great weight and will not be reversed unless clearly wrong, Deutser v. Marlboro Shirt Co., 4 Cir., 81 F.2d 139, 142, yet it must be remembered that on an appeal in equity it is our duty to review the facts as well as the law and that the review contemplated is a real review and not a mere perfunctory approval, Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 926; Standard Accident Insurance Co. v. Simpson, 4 Cir., 64 F.2d 583, 588. We cannot give our approval, in the light of the evidence in the record, to the finding that decedent was married to plaintiff. On the contrary, we are convinced that he was not married to her; that the pretended marriage was a sham and a fraud; that the marriage ceremony, while no doubt honestly performed by the minister, was performed between some other man and plaintiff; and that the great weight of the evidence supports this conclusion.

Reversed.