**B. J. STUMPF, Appellant,**

v.

**FIDELITY GAS CO., a corporation, Montana-Dakota Utilities Co., a corporation and Shell Oil Company, a corporation, Appellees.**

No. 16833.

United States Court of Appeals
Ninth Circuit.

Aug. 25, 1961.

Rehearing Denied Oct. 11, 1961.

Colgrove & Brown, Miles City, Mont., and Gene Huntley, Baker, Mont., for appellant.

Raymond Hildebrand, Glendive, Mont., and Armin M. Johnson, Minneapolis, Minn., and Charles N. Wagner, Denver, Colo., for appellees.

Before CHAMBERS, Chief Judge, and POPE and HAMLIN, Circuit Judges.

POPE, Circuit Judge.

Appellant B. J. Stumpf, plaintiff below, brought this action against Fidelity Gas Co., hereafter called Fidelity, and the other appellees, its assignees, as defendants, to procure a decree that an oil and gas lease originally given by plaintiff to defendant Fidelity had been terminated and forfeited, and to recover certain stat-

utory and other damages because of defendants' refusal to release their claimed interest in the premises described in the lease. The action, originally begun in the state court, was removed to the court below on the ground of diversity of citizenship of the parties.

The lease in question was executed September 7, 1934, and provided for a so-called "primary term" of three years which could be extended by the lessee beyond the primary term by drilling a commercial oil or gas well below 2000 feet on some point on the Cedar Creek Anticline. The primary term expired September 7, 1937.[1] Under date of September 3, 1957, Fidelity wrote to the plaintiff stating: "As you no doubt know, we have during the past year been drilling a deep test well in the Baker field, which well has recently been completed as a commercial oil well." It is the theory of the plaintiff's complaint that this statement was false. It alleges: "That no commercial oil or gas well below 2,000 feet was completed by any of defendants during the primary term of said lease as contemplated by paragraph four (4) of said lease, and said lease, therefore, by its terms, terminated and became, and still is, null and void."

The lease contained in addition to sundry provisions common in oil leases a paragraph 11[2] which authorized the lessee to pool the production under the lease with other producers and owners. Lessee was granted the right to include all of lessor's royalty interest in a unit operating agreement to that effect; and the

assignee of the lessee Montana Dakota Utilities Co., another defendant, made such a unit agreement covering the lands of plaintiff and other royalty owners with itself as unit operator. This agreement became effective October 1, 1938, which was after the termination of the primary term of the lease. The agreement provided that the respective title holders party to the plan would share in the production from the unit, (called Unit No. 7), in the proportion to the number of acres held by the title holder within the area as compared with the total number of acres party to the plan. The only other reference to the unit operation contained in the lease was that referred to in footnote 1, supra.

The substance of defendants' answer was a denial of plaintiff's assertion that no commercial oil or gas well was completed as required during the primary term of the lease; but they further allege that the lease was perpetuated by reason of the commitment to the unit plan of development provided for by the unit agreement above referred to, and that the unit was now producing gas in commercial quantities.

In his reply, plaintiff alleged that the defendant Montana-Dakota Utilities Co., as assignee of the lease, knowing that it had not found oil or gas in commercial quantities below 2000 feet within the time required by the lease, "cheated, tricked, and defrauded the plaintiff by telling him that a search for commercial oil as aforesaid had been successful"; that he had no means of ascertaining

1. As hereafter noted, the lease, in paragraph 11, authorized lessee to include lessor's royalty interest in a "unit operating agreement". The lease also provided: "If said deep test well or a similar well shall be completed as a commercial oil or gas well below 2,000 feet, upon any lands operated jointly with the lands herein described as a so-called unit area as provided in paragraph eleven hereof, such well shall be considered as validating this lease with the same effect as though such well had been drilled on lands herein described, and production from any such well, or production allocated to the lands herein described from

any well in said unit area, shall be considered as being produced on the lands herein described within the meaning of Paragraph 2 hereof."

2. "11. If Lessee at any time shall agree with other Lessees or landowners to develop and operate this lease with other leases or tracts covered by such a cooperative or unit operating agreement, as a single property, for oil and/or gas production, or in accordance with drilling and operating methods common to the several leases or tracts embraced in such agreement * * * Lessee is hereby granted the right to include all Lessor's royalty interest in such agreement."

for himself whether the well was a commercial one and was forced to rely and did rely upon the defendant's "aforesaid false and fraudulent declarations"; that as soon as he learned there had been no commercial oil discovered he repudiated the lease and demanded its release.

It will be observed that here there were two contracts made which, though related, were nevertheless separate and distinct. The first contractual relationship was that between the plaintiff, as lessor, on the one hand, and the defendant lessee and its assignees on the other. This was the oil and gas lease which contained the customary provisions reserving to plaintiff, as royalty to be paid by the lessee, one-eighth of the proceeds derived from the sale of all oil or gas produced.

The second was the unit operating agreement which paragraph 11 of the lease, above referred to (footnote 2, supra), authorized the lessee to execute. In short, by that clause the lessee was granted an agent's authority to execute the unit operating agreement and extend it to cover plaintiff's lands; but the latter agreement was not a part of the lease.

It should be noted that the plaintiff's complaint, first stated in three counts, the third of which was abandoned, seeks two types of relief from the defendants. The first type is that referred to in the first and second paragraphs of plaintiff's prayer where he prays that the oil and gas lease be declared to be "forfeited, null and void", and that the defendants be required to release of record their claimed interest in plaintiff's premises. The second type is represented by the third and fourth paragraphs of the prayer in which plaintiff seeks statutory damages of $100 and special damages of $33,600. As the complaint shows, he asserts these damages resulted from the defendants' failure to release said oil and gas lease.

After the action was at issue, the defendants filed a motion to dismiss it on the ground that plaintiff had failed to join certain parties listed in the motion each of whom was a party indispensably necessary to a full and final adjudication of the controversy. Listed were some 166 persons which an affidavit in support of the motion asserted constituted a listing "of the current owners (other than Montana-Dakota Utilities Co.) of operating rights or working interests committed to the Co-Operative or Unit Plan of Development, Unit No. 7," and the "current owners (other than plaintiff) of royalty and over-riding royalty payable on gas production derived from Unit No. 7". "Unit Plan of Development, Unit No 7", refers to the pooling or unit agreement to which we have previously referred.

The motion to dismiss was granted and the case dismissed without prejudice, and it is from that order that this appeal has been taken. In a memorandum accompanying the order for dismissal, the court stated: "The Court's position is simply this, that under the unit agreement which was authorized by the lessor and by virtue of which the lease was amended, the royalty interest of each lessor in the unit is measured at a rate dependent upon production on all other tracts in the unit and that therefore each such royalty owner has a direct interest in this suit, the object of which is in part to free the premises involved from the unit agreement. Any judgment in this case would, it seems to the Court, necessarily affect all unit royalty owners and that a determination of this case, absent such owners, would be inconsistent with equity and good conscience."

There are cases in which it has been held that where there has been unitization or pooling for development of oil and gas leases all parties to the unit agreement are indispensable parties in a suit to try title to any parcel of land subject to a lease which has been incorporated in the unit arrangement. Leading cases to this effect are Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, and Belt v. Texas Co., Tex.Civ.App., 175 S.W.2d 622. On the other hand, in Nadeau v. Texas Company, 104 Mont. 558, 69 P.2d 586, 593, 111 A.L.R. 874, where plaintiff and defendant were rival claimants to oil leases on the same land, the plaintiff

brought suit to quiet his title to what he alleged was a prior lease; it appeared that defendant, who also claimed under lease from the same original landowner, had signed a unit and pooling agreement with other owners of lands and holders of leases. It sought to abate the suit because of failure to join as defendants the other persons who had signed the unit and pooling agreement on the ground that they were indispensable to the maintenance of the suit. The court held that it was not necessary that they be joined.

Neither the Texas cases cited nor the Montana case present facts which are just the same as those now before us. In the Nadeau case the plaintiff had never dealt with the other signers of the unit or pooling agreement and had not signed it or authorized any one to do so for him. In that respect it differs from our case.[3]

The two Texas cases cited involved actions in trespass to try title to certain lands. Involved in each case were lands upon which Veal and others had executed oil and gas leases to the Texas Company. In each case Veal's title to certain of the lands at the time of the lease was attacked by the plaintiff. Concurrently with the lease by Veal other owners of land executed other leases to the same lessee. All of them provided that all

tracts so leased should be operated as one area, aggregating 6000 acres, each lessor to share proportionately in the production from the unitized block. It was provided in each lease that all these leases should be treated as one lease. In each case the court noted that the effect was to "merge all of the leases into one contract". In the Veal case, the Texas Supreme Court said: "We have demonstrated that the effect of the lease contract here involved is to vest all the lessors of land in this unitized block with joint ownership of the royalty earned from all the land in such block. * * * Stated in another way, a contract affecting land in this State, which grants or reserves mineral royalty in such land, constitutes the owner of such royalty the owner of an estate in such land." 159 S.W.2d 476.

It will be noted that in the cases just referred to, the leasing to the Texas Company and the unitization of all the lands involved was accomplished by what in legal effect was a single instrument, a single contract, the terms of which made all lessors in the unitized block joint owners of interests in all the lands.[4] The Texas cases to which we have referred have been cited many times and frequently followed by other decisions in this field.[5]

3. "The controversy here was whether the lease of the defendant company was valid as against the plaintiff. No attempt was made to quiet the title of the plaintiff as against the whole world, or any other person than defendant. Plaintiff might have brought such an action, but he did not. It does not appear that plaintiff or his immediate predecessors in interest had any transactions with any of the other parties prior to the inception of his title by the execution and delivery of the Reynolds lease. Hence, whatever rights may have been created by these negotiations and transactions between Ewald and the defendant, and between the latter and the various signers of this agreement, could in no wise affect the rights of the plaintiff and, therefore, they are not necessary parties to the settlement of the controversy litigated between plaintiff and defendant." 69 P.2d 593.

4. In the Veal case, holding that all royalty owners under the other lease contracts in the unitized block were necessary (i. e. indispensable) parties to the suit, the court said: "There is no escape from this conclusion, because Thomason seeks in this action to obtain a judgment freeing this land from the Texas Company lease, and if this is done by judgment which names such Company only, the royalty owners under the other leases in this unitized block will have had such royalty interest in this land, for all practical purposes, cut off and destroyed without having had their day in court." 159 S.W.2d at page 477.

5. A discussion of the cases generally would not be profitable here. Many of them are discussed at length in Dedman, "Indispensable Parties In Pooling Cases", 9 Southwestern Law Journal 27, (1955), and in Hoffman, "Voluntary Pooling And Unitization", (1954), pp. 144 to 169.

The primary respect in which the case before us differs from those is that here we have what are essentially two separate contracts. First of all Stumpf had his contract, an oil and gas lease, with Fidelity; in it he authorized the lessee or its assignee to execute another contract, namely, the unitization agreement, and that agreement was executed, as we have seen. The question then arises whether it is possible for Stumpf to procure a cancellation or declaration of nullity of the contract made with Fidelity without attacking or otherwise affecting the continued existence of the unitization agreement or questioning the validity thereof, or in any manner affecting the sundry and various persons interested therein.

It may be noted here that in his complaint Stumpf makes no attack upon the initial validity or continuing operation of the unitization agreement. He seeks an adjudication that the lease which he executed on September 7, 1934, terminated and became null and void because of the failure of the defendants to complete a commercial oil and gas well below 2000 feet within the primary term of that lease. After the defendants in their answer had set up and alleged the execution of the unitization agreement, copy of which was attached to their answer, plaintiff then in the reply which he was directed to file, alleged that the inclusion of the plaintiff's land in the unit agreement was void because the lease under which defendants claimed had itself terminated. (The primary term of the lease expired September 7, 1937; the unitization agreement became effective October 1, 1938; it was dated October 28, 1937.)

It is unnecessary to determine whether this portion of the reply operated to enlarge the claims under the complaint, for as noted hereafter, we are of the opinion that it makes no difference in the result here.

■■ This brings us to the question whether the omitted parties here are indispensable within the meaning of that term and as defined in the adjudicated cases. It is not sufficient for a defendant to demonstrate that these persons would

be "proper" or "necessary" parties within the meaning of Rule 19, F.R.Civ.P., 28 U. S.C.A. Those rules were not intended to and did not effect any alteration in the standards by which the existence of an indispensable party may be determined. Without going into any extended discussion of what constitutes an indispensable party we think it suffices to refer to the statement of the test to be applied found in State of Washington v. United States, 9 Cir., 87 F.2d 421, 427, a summary which has frequently been alluded to with approval. This court there said: "There are many adjudicated cases in which expressions are made with respect to the tests used to determine whether an absent party is a necessary party or an indispensable party. From these authorities it appears that the absent party must be interested in the controversy. After first determining that such party is interested in the controversy, the court must make a determination of the following questions applied to the particular case: (1) Is the interest of the absent party distinct and severable? (2) In the absence of such party, can the court render justice between the parties before it? (3) Will the decree made, in the absence of such party, have no injurious effect on the interest of such absent party? (4) Will the final determination, in the absence of such party, be consistent with equity and good conscience?

"If, after the court determines that an absent party is interested in the controversy, it finds that all of the four questions outlined above are answered in the affirmative with respect to the absent party's interest, then such absent party is a necessary party. However, if any one of the four questions is answered in the negative, then the absent party is indispensable."

So far as plaintiff's complaint seeks recovery of damages, it is clear that persons other than defendants who happen to be interested in the unit agreement would be neither necessary nor indispensable parties. It is also clear that if the plaintiff should succeed in demonstrating that the terms and conditions of his lease were

not complied with by the defendants and that in consequence it became the duty of the lessee to execute a release as required by Revised Codes of Montana, 1947, Sec. 73–114, 73–115, 73–116, then the failure to execute such a release ought to entitle him to his damages, and the recovery of them should be a matter of no interest to any other party. As noted in Abell v. Bishop, 86 Mont. 478, 284 P. 525, noncompliance with the statute mentioned gives rise to three distinct causes of action, one for cancellation of the lease, one for the recovery of a statutory penalty, and one for damages. No reason is perceived why plaintiff here could not, regardless of nonjoinder with the other persons referred to, have recovery for such damages as he might be able to prove.

But apart from that consideration, we think that the decided cases would demonstrate that the persons mentioned are not indispensable parties even as to that portion of plaintiff's action in which he seeks a declaration that the lease has terminated and is now null and void.

It seems clear that if Stumpf were permitted to proceed in this case and succeeded in demonstrating that the lease in question was not extended beyond its primary term, and that hence it had come to an end, then the result of a judgment to that effect as against the defendants here would be that henceforth plaintiff would be entitled to eight-eighths or 100 percent of the oil or gas produced, or deemed produced, from his land. If the decree ran against the lease itself only and in no manner purported to deal with the continued existence of the unitization agreement, then the operator under that unit agreement would in no manner be prevented from continuing to operate and

extract oil and gas in the manner therein provided.[6] The net result of the whole thing would be that the distributive shares of the proceeds of the sale of gas applicable to plaintiff's interest would be 100 percent to Stumpf instead of one-eighth to Stumpf and seven-eighths to the defendant Montana-Dakota Utilities Co.

If that is a correct anaylsis of the situation, then it would appear that each of the four questions posed in State of Washington v. United States, supra, could be answered in the affirmative. The interest of the absent parties to the unit agreement would be distinct and severable from the question of who gets the seven-eighths share in the gas produced. Such parties would not be necessary to enable the court to render justice between the parties to the original lease or their assigns. In making an award which would give 100 per cent of the proceeds from plaintiff's land to him would have no injurious effect upon the interest of any absent party; and such a determination would be consistent with equity and good conscience.

Indeed a good deal may be said to the effect that considerations of equity and good conscience argue in favor of permitting plaintiff's action to proceed. If the mere fact of the execution of the unitization agreement makes all parties interested in it indispensable, then it is obvious from the facts shown in this record that no matter how right plaintiff may be as to the facts alleged in his complaint, he is denied access to the courts, both federal and state. Some of those parties listed in the motion which the court sustained are shown to be residents of Montana and joining them would oust the court of jurisdiction. As a practical matter, some of them are shown to be deceased,

6. It might be argued that if Montana-Dakota loses its seven-eighths interest in the production attributable to plaintiff's land, it will be unlikely to devote full energy to production on the unit, and thus other parties in the unit will suffer. But Montana-Dakota made this contract between itself as "vendor" and itself as operator, and obviously drew the agreement. It must be construed most strongly against it. But under any construction, Montana-Dakota as operator is firmly bound to operate the unit efficiently, to the end of securing "economical development" and the "greatest possible ultimate recovery". These obligations it cannot shed.

and probably the determination of who are all the parties interested in the unit agreement would be beyond the means of an ordinary litigant. Nor does it appear that he could gain access to the state courts for many of these parties are shown to be non-residents of the state and it may be presumed unavailable there.[7]

An examination of the adjudicated cases whose facts most closely resemble those present here shows that the tentative conclusion suggested above, namely, that the absent parties here are not indispensable, is supported by the authorities. In Hudson v. Newell, 5 Cir., 172 F.2d 848, modified at 5 Cir., 174 F.2d 546, the plaintiffs claimed certain lands as heirs of one Hudson who during his lifetime had left a life estate therein to his wife. The wife, notwithstanding her limited interest, had made conveyances in fee of parts of the land to persons who in turn conveyed to others and they had made leases to certain oil companies reserving one-eighth interest in the royalties. Plaintiffs brought suit claiming certain of these lands and asking for a decree that they were the true owners of the land and of the mineral rights therein and of the oil and gas removed from it by the defendant oil companies who were named defendants with their respective lessors. The leases permitted unitization of the land leased together with other tracts for oil production, and persons interested in those other tracts included in the unitization arrangement were not made parties or joined in the suit. The

trial court dismissed the suit because of the absence of indispensable parties. On its first opinion the court of appeals affirmed that decision and stated the facts with respect to these persons whose interest arose only through unitization of their lands with those in suit. This statement together with the reason given for the initial affirmances found in paragraph 6 of the court's opinion which was as follows: "The question of 'unitization' and its connection with indispensable parties remains. A number of the claimants not joined have no interest unless through unitization of their lands with those in suit. In Mississippi, as elsewhere, the number of permissible oil wells is limited, and to secure production from small tracts not entitled to a well each, several tracts are united by formal recorded agreement to be served together by a single well, the production from which is to be prorated according to acreage among the several tract owners. Such units, before the filing of these suits, had been duly formed, in part from lands included in the suits. The question is whether the owners of other unitized lands acquired such an interest or title in those in suit as that they must be joined in order to grant even partial relief. The district judge held that in Mississippi the oil in place is, as in Texas, conveyed by oil leases, royalty sales, and other formal recorded contracts, and that a unitization contract vests joint ownership jointly in all the unitized reserves in place and in the royalty oil produced from the well, citing Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472.[8] While no

7. To hold that all these absent parties are indispensable would accomplish what Mr. McGee threatened to do to the bank which held a mortgage on his land which it was threatening to foreclose. As related by Professor Masterson, ("Indispensable Parties in Oil and Gas Litigation," Sixth Annual Institute on Oil and Gas Law, Mathew Bender & Co., 1955, p. 160): "In 1925 an Iowa landowner named McGee asked a bank to extend his note which was secured by a lien on land. The vice-president with whom he was dealing refused. Thereupon McGee showed the vice-president a deed signed by

McGee and which he said he was going to record right then if he didn't get his extension. This deed named the following grantees: 'Each and every member of the American Legion of Iowa, each and every member of the Independent Order of Odd Fellows of Iowa, each and every member of the Knights of Pythias of Iowa, and each and every attorney at law in Iowa.'" See State v. McGee, 200 Iowa 329, 204 N.W. 408.

8. As we shall point out hereafter the reasoning in this portion of this quotation will be inapplicable in our case because

Mississippi authorities in point are cited, we believe this to be correct, so that all these owners must be parties or the unitized lands must be excluded from any decree. No adoption by plaintiffs appears of the unitizations of their lands." 172 F.2d at page 852.

Following that decision the court granted a rehearing of the case en banc. and withdrew paragraph 6 quoted above. The court held: "As to Paragraph 6, appellants have filed a formal disclaimer of any intention to interfere with the unitizations formed before the filing of these suits to which they were not parties; and they offer so to amend their pleadings in this court or in the district court as to adopt and ratify such unitizations and to seek only to substitute themselves for their adversaries in title in these suits in such unitizations, without affecting in any manner the rights of the other parties thereto. If this is done such other parties will not be affected by such relief and are not indispensable parties to the suits. Paragraph 6 of the opinion is therefore withdrawn, and the disclaimer and agreement to ratify and adopt the unitizations above referred to will, as is therein proposed, be made a part of the mandate to the district court which shall cause the appellants to so amend their pleadings and prayers with reference to the unitized lands as to seek a decree, if they establish their title, which shall substitute themselves for their adversaries in title without affecting the rights of the other parties to the unitization agreements who are not before the court. This done, the suits may proceed without the presence of these absent parties." Hudson v. Newell, 5 Cir., 174 F.2d 546.

The reasons stated in the case from which we have just quoted would compel a decision here that the absent parties in this case whose interests arise solely out of the unitization agreement are not indispensable parties. As the court there observed, if there be no attack upon the unitization agreement, as such, and if the effort in the suit is merely to substitute the plaintiffs for their adversaries· in title, then the other parties will not be affected by such relief, their rights will not be affected in any manner by the decree sought and the other parties would not be indispensable to the suit.

Of course the plaintiff here has not offered to adopt and ratify the unitization. In his complaint he has not attacked it. To that extent it seems clear that the validity and extent of the unitization agreement is simply not at issue in this case regardless of whether in some other action, at some other time, plaintiff might be able to make some attack upon it.

The case of Hutchins v. Birdsong, Tex. Civ.App., 258 S.W.2d 218, 221, and the case of Fussell v. Rinque, Tex.Civ.App., 269 S.W.2d 442, 444, are in accord with Hudson v. Newell, supra. In the first of those two cases where the plaintiff, as in the Hudson case, expressly ratified and approved the pooling agreement, the court held that this made it unnecessary to make the other parties interested in the unit parties to the litigation since the litigation was narrowed down to a contest between him and the defendants named in the suit. The suit was brought to reform certain deeds given by plaintiff to defendants' predecessors by inserting a clause reserving a half interest in the oils, gas and other minerals in the lands conveyed. The court said that by reason of the ratification mentioned, "the litigation was narrowed down to a contest between him and appellants as respects the title to an undivided one-half of the minerals in and under the tract of land in controversy," and that under these circumstances, "the rights of other parties to said unit are in no wise affected by the judgment in this case."

In the second of the last cited cases, the court said: "Appellants' objection, under their first point of error, that the owners of the other land than that here

of the express provisions of the unitization agreement here involved to the effect that this particular contract should have

no such operation and should not be construed as affecting or passing title to any land.

involved in the Unit No. 2, of the above referred to Cities Service Oil Company, had not been made parties to this suit, is not sound, because both sides to this controversy recognize the validity of that Oil Company's unit; hence, this suit between the parties to it was reduced to a determination of which one of them would receive the interest allotted by that company to the 20 acres here involved." 269 S.W.2d at page 444.

Also in accord is the Texas case of Sohio Petroleum Co. v. Jurek, Tex.Civ. App., 248 S.W.2d 294, 298. The court there properly distinguished the cases of Veal v. Thomason, supra, and Belt v. Texas Co., supra, on the ground that in each of these cases all of the parties, both those named defendants and the others who were omitted, had joined in the execution of a single community lease which itself provided for the unit arrangement.

In the case of Whelan v. Placid Oil Co., 5 Cir., 198 F.2d 39, 42, the Court of Appeals referred only to the first opinion in Hudson v. Newell, supra, apparently unmindful of the modified decision in that case, and relying on Veal v. Thomason, supra, held that all mineral owners of the lands who had joined in a unitization agreement were indispensable parties who should have been made defendants in the suit. The action who brought by Placid Oil, the lessee under an oil and gas lease, the primary term of which had expired. Before its expiration the lessee and some of the successors to the original lessors established a unit which included the leased acres. Under that unitization agreement it was provided that the lessee should be granted a specified period within which to commence operations for the drilling of a well in the unit area. The commencement and completion of such well on any portion of the unit was stipulated to have the same effect as if the well were commenced and completed on each lease in the unit. The successors in interest of the original lessors executed an oil and gas lease to Whelan. Placid

Oil claimed a one-half interest in seven-eighths of the oil and gas under the original tract and named Whelan as defendant. It had judgment below but on appeal Whelan contended that the various owners of the royalty interests under the unit were indispensable parties whose joinder would deprive the court of jurisdiction based upon diversity of citizenship. The court sustained this contention citing as its authority for this decision the Veal case. The court said: "This is true for the reason that the unitization agreement vests all the lessors of land in the unitized block with joint ownership in all the unitized reserves in place in the unit—the ownership being in the proportion which the acreage each member contributed to the pool bears to the total acreage in the unitized block."

Since the unitization agreement was not a part or parcel of the original lease itself, as it was in Veal v. Thomason, this decision is not easy to understand. Its different facts should distinguish it from the Veal case. The case has been criticized,[9] rightly, we think, as demonstrating a misunderstanding of the Veal case and as generally unsound. It cannot be reconciled with that court's decision in Hudson v. Newell, supra, or with the other decisions cited above which are in accord therewith. We cannot accept the reasoning thereof.

However, even if we assumed the soundness of the decision upon the facts of that case and under the law applicable to lands in the State of Texas, it appears that for a special reason the conclusions of that case are wholly inapplicable here because of the express terms of the unitization agreement itself. Section 17 of that agreement recites as follows: "That nothing herein contained, implied or contemplated in relation hereto shall create or be deemed to create a partnership between the parties hereto, but they shall each hold their respective right, titles and interests in their respective tracts according to existing leases, permits, opera-

9. See Dedman, "Indispensable Parties In Pooling Cases", 9 S.W.Law Journal 27, at pp. 61 to 63.

ting agreements and gas purchase or sales contracts and any extensions, renewals, substitutions, or modifications thereof, unchanged except as to the right of the Operator to operate Unit No. 7." Even more significantly, it is provided in section 19 as follows: "That nothing herein contained shall be construed as affecting or passing title to any lands, leases, or permits, but the Operator shall acquire operating rights only."

It will be noted that the reason given in the quoted portion of the court's opinion, supra, is that the effect of the unitization agreement was to vest all lessors of land in the entire block with joint ownership in all acreage which each member contracted to pool. This is the theory of reciprocal conveyancing. Obviously under the present unitization agreement no such result could occur, and the stated basis for the decision in the Whelan case is wholly wanting.[10] The quoted language of sections 17 and 19 of the instant lease furnishes a further ground for distinguishing the Veal case, supra, where, as we have noted, the court placed much emphasis upon its reciprocal conveyancing theory.

It is plain that the question of the validity, operation or extent of the unitization agreement is not in issue here. The only thing at issue is who shall receive the seven-eighths interest in the oil and gas which defendants claim under the lease. Whether plaintiff is or is not a party to the unitization agreement is simply not for adjudication in this ac-

tion. If it should ultimately develop in a later suit brought by Stumpf that he is not a party to it then he will be in the position of the plaintiff in Nadeau v. Texas Co., supra, where the plaintiff had not signed the unitization agreement. If it should turn out that he is bound by the unitization agreement, then he will be in the position of the plaintiff in Hudson v. Newell, supra, and Hutchins v. Birdsong, supra, where the plaintiffs conceded their responsibility.

It appears to be the position of the defendants here that the plaintiff did attempt to attack the unit agreement. It is not clear just what is the basis for this contention. Possibly it is based upon the fact that in his reply plaintiff alleges that the inclusion of his land in the unit agreement was void because the lease itself had theretofore become void.

Disregarding any problem of pleading relating to what was formerly referred to as a departure in a reply and assuming that plaintiff had included in his complaint a count seeking invalidation as to him of the unitization agreement, we would have a situation which would still fall short of presenting a case of absence of indispensable parties. Of course it could be said that to obtain complete relief, that is to say, relief from both the lease and the unit agreement, all of the persons who are members of the unit agreement ought to be made parties; but it does not follow that such persons are indispensable parties to the granting of any relief whatever to this plaintiff. The

---

10. See Hoffman: "Vountary Pooling and Unitization", p. 167: "In order to avoid the difficulties which may spring from the rule that the pooling or unitization agreement constitutes a cross-conveyance of real property interests among the parties, it is frequently the practice to provide expressly in the agreement that no such effect is intended by the parties. There can hardly be any objection in the law to such an express agreement that the pooling or unitization shall not constitute an exchange or transfer of real property interests. Presumably such a provision is valid and therefore effective for the purpose of nullifying any cross-conveyancing which would otherwise result."

The holding of the court in Veal v. Thomason, supra, that the execution of the unitization agreement operated as a reciprocal conveyancing of royalty interests between the various parties concerned so that each of the parties is deemed an owner of a real property interest in the land of every other party, has been the subject of much criticism. See Dedman, "Indispensable Parties in Pooling Cases", supra, 9 S.W.Law Journal 27 at p. 39, and Hoffman, "Voluntary Pooling and Unitization", supra, at pp. 159 to 161. "In this sense the rule of the Veal and Belt cases is unfortunate".

recognized rule is stated in Rule 19(b) of the Rules of Civil Procedure as follows: "When persons who are not indispensable, but who ought to be parties if complete relief is to be accorded between those already parties, have not been made parties and are subject to the jurisdiction of the court as to both service of process and venue and can be made parties without depriving the court of jurisdiction of the parties before it, the court shall order them summoned to appear in the action. The court in its discretion may proceed in the action without making such persons parties if its jursidiction over them as to either service of process or venue can be acquired only by their consent or voluntary appearance or if, though they are subject to its jurisdiction, their joinder would deprive the court of jurisdiction of the parties before it; but the judgment rendered therein does not affect the rights or liabilities of absent persons."

The substance of this rule is taken from the former equity rule 39 upon which this court had occasion to comment at length in the case of State of Washington v. United States, supra, saying at 87 F.2d 428, that, "if joinder of the necessary party would oust the court of jurisdiction over the other parties, then the court may proceed to a decree in the absence of such necessary party."

It is thus apparent that while in order to obtain complete relief in the supposititious case of a suit by plaintiff to rid himself both of the lease and of the unitization agreement, the other persons interested in the latter agreement would be deemed necessary parties, yet this does not prevent the court from proceeding to grant a portion of the relief sought and entering a judgment which, as the rule states, would not affect the rights or liabilities of the absent persons. In short, nothing would then prevent the court from determining the issue respecting the lease as between plaintiffs and defendants, making it clear that its decree in no manner affects or concerns the rights of any absent parties under the unit agreement. As stated in Dunham v. Robertson, 10 Cir., 198 F.2d 316, 319: "Necessary parties are sometimes said to be those within the jurisdiction of the court whose presence is necessary to a complete adjudication of the controversy, but whose interests are separable and of such a nature that the court may proceed to final judgment in their absence without adversely affecting them. Rule 19(b) does not contemplate that persons not indispensable shall be made parties to a diversity action if the effect would be to deprive the court of jurisdiction of the parties before it."

A multitude of cases demonstrates the general proposition that there is no rule that a court must do everything at once. That the court when possible should grant some portion of the relief sought was discussed in Mackintosh v. Marks' Estate, 5 Cir., 225 F.2d 211, 215. There, after reviewing other cases, the court said: "We hold that the district court erred in requiring all persons having or claiming any interest in the lands to be made parties, and in dismissing the suit upon plaintiffs' failure to join those whose joinder would have defeated the jurisdiction of the court. *Instead, the court should retain jurisdiction and limit any relief granted to such as can be given without prejudice to the absent parties.*" (Emphasis added.) The court there applied the principle stated in Waterman v. Canal-Louisiana Bank Co., 215 U.S. 33, 49, 30 S.Ct. 10, 14, 54 L.Ed. 80, as follows: "If the court can do justice to the parties before it without injuring absent persons, it will do so, and shape its relief in such a manner as to preserve the rights of the persons not before the court. If necessary, the court may require that the bill be dismissed as to such absent parties, and may generally shape its decrees so as to do justice to those made parties, without prejudice to such absent persons." See also Oxley v. Sweetland, 4 Cir., 94 F.2d 33, 35; Asher v. Bone, 9 Cir., 100 F.2d 315, 318; Spring v. Ohio Oil Co., 5 Cir., 108 F.2d 560–561; and Hudson v. Newell, supra.

It is therefore apparent that even if plaintiff had sought in this action not only a determination of the invalidity of the lease but also a determination of the invalidity of the unit agreement, the appropriate thing for the court to do (if the plaintiff was shown to be entitled thereto) would be as suggested in the Waterman case,—to grant the relief sought respecting the lease contract and shape its relief as to this in such manner as to preserve the rights of persons not before the court.

■ It will be apparent from what we have said that our primary difference with the trial court relates to a portion of its opinion in which it is said: "Plaintiff by his action here would withdraw his premises from the unit which would effect at least a partial rescission or cancellation of the unit agreement." In our opinion such a result is not involved in this action. As we have indicated, even if such an effort had been added to the suit, which primarily relates to the lease itself, the court ought, as suggested in Rule 19, supra, to proceed in the action, rendering such judgment as may be appropriate, and expressly providing that the same does not affect the rights and liabilities of the absent parties.

The judgment is reversed and the cause remanded with directions to entertain the action and to proceed therewith in such manner as may not be inconsistent with this opinion.

Upon Petition for Rehearing

PER CURIAM.

The petitioners-appellees seek a rehearing on the ground that if judgment were entered in this case decreeing termination of the lease at the end of the primary term thereof, this would inevitably withdraw plaintiff's land from the unit and therefore would affect the absent unit interest owners. In consequence of this premise petitioners assert that the result envisioned by us in our opinion would be altogether impossible. The reference here is to the sentence of the opinion: "If the decree ran against the lease itself only and in no manner purported to deal with the continued existence of the unitization agreement, then the operator under that unit agreement would in no manner be prevented from continuing to operate and extract oil and gas in the manner therein provided."

It is true that our opinion did make reference to the primary term of the lease; but it was not within the contemplation of the court that if the trial court should grant the appellant relief respecting the lease that such a judgment would decree that the lease terminated at the end of the primary term. The complaint itself shows that forfeiture or cancellation of the lease could not be effected until after December 27, 1955, the date of the notice of default, copy of which is attached to the complaint. Paragraph VII of the complaint alleges that such notice was given pursuant to paragraph 9 of the lease. Paragraph 9 of the lease, which was attached to the complaint, reads in part as follows:

"The breach by Lessee of any obligation arising hereunder shall not work a forfeiture of this lease nor be grounds for cancellation thereof in whole or in part save as herein expressly provided. * * * Should Lessee default in any of the express terms and conditions of this lease, no forfeiture or cancellation thereof shall be declared, nor any steps or proceedings to effect a forfeiture or cancellation taken unless and until Lessor shall have first given Lessee written notice, specifying the time, nature and extent of such default, and Lessee has wholly failed for a period of ninety (90) days thereafter to remedy such default."

■ Perhaps our opinion was at fault in not expressly quoting this provision or noting the date of the notice; but it seems to us to be clear that on the date when the unit operating agreement became effective, October 1, 1938, the lease was still in effect and even after the giving of the notice the lessee could have remedied any default and kept the lease

in continuing effect. This means that the authority to enter into the unit operating agreement recited in paragraph 11 of the lease was an authority still in existence on October 1, 1938. If as a part of a working agreement between A and B, A authorizes B to bind him to another contract with C, and B does so, the contract between A and C is not itself terminated by a rescission, cancellation or forfeiture of the original agreement between A and B providing that agreement was still in effect and the authority not terminated at the time that the contract with C was executed.

The petition for rehearing is denied.